Filed 3/25/14

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| K.F. et al., | D064534 |
| Petitioners, | (San Diego County Super. Ct. No. NJ14792) |
| v. | |
| THE SUPERIOR COURT OF SAN DIEGO COUNTY, | |
| Respondent; | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Real Party in Interest. | |

PROCEEDINGS in mandate after referral to a Welfare and Institutions Code section 366.26 hearing. Harry M. Elias, Judge. Petitions granted in part and denied in part; stay vacated.

Julie E. Braden for Petitioner K.F.

John P. McCurley, under appointment by the Court of Appeal, for Petitioner M.M.

No appearance for Respondent.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Paula J. Roach, Deputy County Counsel, for Real Party in Interest.

Jessica B. Smith, under appointment by the Court of Appeal, for Minor.

At age three months, S.F. was removed from the custody of her parents, K.F. (Father) and M.M. (Mother) and declared a dependent of the court after her parents brought her to the emergency room and she was found to have suffered two subdural hematomas, numerous rib fractures, an elbow fracture, and bruising. After a jurisdictional hearing, the juvenile court found that (1) the parents committed, knew about, or reasonably should have known about severe abuse to a child under age five (Welf. & Inst. Code,[1] § 300, subd. (e) (hereafter § 300(e) abuse)), and (2) the parents failed or were unable to protect the child from serious physical harm (§ 300(b) (hereafter, § 300(b) failure to protect)). The court stated its section 300(e) abuse finding was based on a preponderance of the evidence, and its section 300(b) failure-to-protect finding was based on clear and convincing evidence. The court thereafter decided to bypass reunification services under (1) section 361.5(b)(5) based on its section 300(e) abuse finding, and (2) section 361.5(b)(6) based on its section 300(b) failure-to-protect finding.

In the mandate proceedings before us, Father contends the record does not support the section 300(e) abuse finding as to him. Both parents challenge the denial of reunification services.

We conclude there is sufficient evidence to support the court's section 300(e) abuse finding as to Father. However, we hold the court erred in denying reunification services to the parents. Denial of reunification services requires findings based on clear

---

[1] Subsequent unspecified statutory references are to the Welfare and Institutions Code. For convenience, we omit the word "subdivision" when citing to this statute.

2

and convincing evidence. Because the court's section 300(e) abuse finding was based on a preponderance of the evidence, this finding cannot support denial of services under section 361.5(b)(5). Further, although the court's section 300(b) failure-to-protect finding was made by clear and convincing evidence, the record shows that the infliction-of-harm finding required to bypass reunification services under section 361.5(b)(6) was predicated on the same facts as the section 300(e) abuse finding, which was established only by a preponderance of the evidence. Accordingly, the denial of reunification services under section 361.5(b)(6) is likewise unsupported.

We also reject the Health and Human Services Agency's argument that the *mere existence* of a section 300(e) abuse finding satisfies the clear and convincing evidence showing needed to trigger application of the section 361.5(b)(5) reunification services bypass provision. Instead, we hold the *facts* underlying the section 300(e) abuse finding must be established by clear and convincing evidence.

Father's petition is denied as to the challenge to the sufficiency of the evidence on the section 300(e) abuse finding. Father's and Mother's petitions are granted as to the challenge to the denial of reunification services.

FACTUAL AND PROCEDURAL BACKGROUND

I. *Overview*

S.F. was born in December 2012, when Mother and Father were 19 and 20 years old, respectively. Mother lived with her parents and two siblings, and Father lived with his grandmother. As we detail below, on numerous occasions Mother and Father cared

3

for S.F. together. S.F. was also cared for by Mother alone, by Mother's parents, and, occasionally, by Father's grandmother.

On several occasions in December 2012 and January and February 2013, S.F. was examined by a pediatrician. At a visit on January 21, 2013, the pediatrician observed that she was "well appearing." At a visit on February 21, Mother was noted to be "feeling sad" and was referred to mental health services. At this visit, the parents reported that S.F. had been throwing up four times a day for two weeks, and the doctor diagnosed a reflux condition and prescribed medication. The parents reported that S.F. stopped vomiting about one or two weeks after starting the medication. About one month later, on March 17, Mother took S.F. to the emergency room because she was eating less, had not urinated for almost 24 hours, and had "red material" (apparently blood) in her diaper. S.F. was tested for a urinary tract infection and was again prescribed medication for a reflux condition.

Five days later, on the morning of March 22, the parents took S.F. to the emergency room. Medical personnel noted that she was having "periods of apnea" and she had an "[i]rritable cry" when moved. The parents reported that they stayed at Father's house the night of March 20. S.F. slept more than usual and did not wake up at her usual time on the morning of March 21. She initially would not eat but eventually drank two ounces from her bottle. They noticed her chest was "moving strangely." Father believed S.F. had a " 'mini seizure' "; she looked at Father but was not focusing; and Father "patted her to resuscitate her." Father acknowledged that his resuscitation efforts bruised S.F.

4

The parents said that S.F. had another episode later in the afternoon, but seemed fine by the evening. However, on the morning of March 22, S.F. was "fussy." When she vomited blood, the parents drove her to the emergency room.

During their examinations, the doctors determined that S.F. had bruises on her thigh, buttocks, and flank; numerous rib fractures; an elbow fracture; and two subdural hematomas.[2] A shunt was inserted to drain " 'the cerebrospinal fluid from [her] head to her abdomen.' " She had 14 rib fractures, six on one side and eight on the other.

The San Diego County Health and Human Services Agency (Agency) detained S.F. in protective custody and filed a petition alleging section 300(e) severe physical abuse on a child under age five by a parent, or by a person known to the parent if the parent knew or reasonably should have known about the abuse. The Agency placed S.F. in the care of her paternal grandfather and his wife, and provided notice it intended to ask the juvenile court to bypass reunification services and set a section 366.26 permanency planning hearing.

The jurisdictional and dispositional hearings were held in July and August 2013. After hearing the evidence, the court (1) found true by a preponderance of the evidence the section 300(e) abuse count, and (2) amended the petition to add a section 300(b) failure-to-protect count and found this count true by clear and convincing evidence. At the disposition hearing, the court declared S.F. a dependent, denied reunification services under section 361.5, and scheduled a permanency planning hearing.

_____

2       S.F. was also initially diagnosed with a leg fracture and spinal compression fractures, but these diagnoses were later called into question.

## II. *Evidence Presented at the Jurisdictional Hearing*

Several medical experts (Drs. Thomas Grogan, Cynthia Kuelbs, and Mark Nunes) testified at the jurisdictional hearing regarding the causes, timing, and detectability of S.F.'s injuries. Additional witnesses included Father and his grandmother, Mother and her parents, the Agency's social worker, and a psychologist called by Father.

### A. *Expert Testimony*

According to the expert testimony, S.F. suffered more than one episode of nonaccidental trauma resulting in the subdural hematomas, rib fractures, elbow fracture, and bruising. Two separate events caused her subdural hematomas; the initial event would have been "very severe and noticeable," and the second event caused a "second bleed . . . that . . . layer[ed] on top" of the first bleed. The hematomas could have been caused by an impact, shaking, or a fall "with some rotation to it." S.F.'s rib fractures could have been caused by someone grabbing her and compressing her rib cage. Her bruises were likely caused by some sort of rough handling.

As to the timing of her injuries, the experts stated it was difficult to determine with precision when the subdural hematomas occurred. The doctors opined the head injury causing the first subdural hematoma could have occurred around the time of the February 21 pediatrician visit when the parents reported vomiting and irritability. However, Dr. Kuelbs could not determine how far in advance of the February 21 pediatrician visit the trauma may have occurred. Further, Dr. Kuelbs acknowledged S.F.'s symptoms in February could have been related solely to the reflux condition and unrelated to the head

injury, and it was not possible to say absolutely when the head injury occurred. Dr. Kuelbs believed a second head injury resulted in the symptoms that occurred on March 21, the day before she was admitted to the hospital on March 22. Dr. Kuelbs also opined that at the time of her admission on March 22, S.F. had "symptoms of a diffused brain injury" but not a lot of blood in her head; her symptoms would not have been explained solely by a re-bleed of the original hematoma; and this suggested that she suffered "an injury to her brain and the bleeding was a marker to it." Dr. Grogan testified that S.F.'s March 22 CT scan showed no evidence of soft tissue swelling; it takes about three to five days for soft tissue swelling to dissipate; and thus it would be unlikely that S.F. suffered a head injury within three days of March 22.

Dr. Grogan estimated that on March 22 S.F.'s rib fractures were 10 to 14 days old, and her elbow fracture was three to five days old. Dr. Kuelbs generally agreed, but explained it was not possible to determine exactly when the injuries occurred. Dr. Nunes estimated the rib fractures occurred about seven to 21 days before March 22, and emphasized the time calculations were "by no means a precise science." According to Dr. Grogan, the rib fractures could have been caused at the same time or sequentially within a short period of time. Dr. Kuelbs believed the rib fractures were inflicted at different times because they were in different stages of healing.

As to detectability of S.F.'s injuries, Dr. Kuelbs testified it would be difficult for a parent who did not cause or see the infliction of the head injury to know that a subdural hematoma had occurred. The parent might see a change in the baby, such as irritability,

7

vomiting, and abnormal sleeping, but the parent and doctor might reasonably think the baby had a viral illness or reflux disease. Similarly, Drs. Kuelbs and Nunes testified that rib and elbow fractures might not be apparent to parents who did not cause or witness the infliction of the injuries. Rib fractures are generally painful for a day or two, but unless the baby screamed when picked up, a parent might think the baby is just fussy. Also, the elbow fracture might not have caused symptoms because babies "at that age aren't doing anything to put pressure" on the elbow area.

B. *Testimony About S.F. While at Father's and Mother's Homes*

The witnesses, including Father, Mother, Father's grandmother (Paternal Great-grandmother), and Mother's parents (Maternal Grandmother and Maternal Grandfather), testified consistently regarding the caretaking arrangements for S.F. Mother and S.F. stayed at both Father's and Mother's homes for several days at a time, going back and forth between the two residences.

When S.F. stayed at Father's home, Mother was always there. Father and Mother slept in Father's bedroom, and S.F. slept in a playpen in Father's bedroom for the first two months while Mother was breastfeeding. In early February, when S.F. was about two months old, the parents moved S.F. into a separate bedroom (the nursery) that was a few steps from Father's bedroom and equipped with a baby monitor. If S.F. needed her diaper changed during the night, Father or Mother would change her in the nursery and then bring her into Father's bedroom where they had the feeding supplies. S.F. was now drinking only formula; Father was comfortable with feeding her; and he would

sometimes be the one who fed her the bottle. After she finished her bottle and fell asleep, one of them would take her back to the nursery. Father occasionally bathed S.F. in Mother's presence, and Mother was always present when Father played with her.

When Father was gone from home taking classes, Mother stayed at Father's home with S.F. and Paternal Great-grandmother. Paternal Great-grandmother worked from home; she was almost always there at the residence; and she saw S.F. constantly throughout the day. Paternal Great-grandmother occasionally fed S.F. or changed her diaper, and on one occasion took care of S.F. when the parents went to the store, and on another occasion when they went to a movie. Paternal Great-grandmother testified that the parents were the main caregivers, and Father was seldom alone with S.F. because Father and Mother "seemed to want to do everything together" when taking care of S.F.

Father testified he would "swaddle" S.F., meaning "wrapping the baby in the tight secure blanket so she feels comfortable to go to sleep." He explained he had learned the technique from hospital personnel; he was "really good" at it; and S.F. had no sleeping issues at his house. In contrast, Father and Mother testified that Mother was not as good at swaddling, and because of this S.F. had more trouble falling asleep at Mother's home.

Father submitted a calendar depicting the dates that S.F. was at his home. He calculated these dates based on iPhone photos he took of her while she was with him, stating he took photos of her every day that she was in his home. Father's calendar shows she was with him on a regular basis after her birth until she was removed on March 22, although there were time gaps of several days when she was not with him. Among these

9

time gaps, Father claimed that S.F. was not with him for a 14-day period from February 8 through February 21.[3] Mother testified that Father accurately charted the dates she and S.F. were at Father's house based on the iPhone photos. Paternal Great-grandmother concurred with Father that S.F. was not at their home for about 10 days to two weeks in February.

When S.F. was at Mother's home, she slept with Mother in Mother's bedroom. She was cared for primarily by Mother, with assistance from Maternal Grandmother and, to a lesser extent, Maternal Grandfather. Maternal Grandparents took care of S.F. when Mother went shopping about once a week; when she took a shower or a nap; and for a couple of days (February 14 to 16) when Mother and Father went to Catalina. Sometimes when S.F. cried at night, Maternal Grandmother would take S.F. from Mother's room so Mother could rest.

All of the witnesses agreed that other persons who stayed or visited at Mother's or Father's residences did not take care of S.F. Further, all of S.F.'s caretakers testified they did not do anything that might have injured S.F.; they did not know she had been injured; they never were concerned that someone was injuring her; and they did not know who caused the injuries. The caretakers testified that S.F. never cried out in pain or cried excessively, and no one ever saw anyone handle her roughly or inappropriately. Father said that Mother told him and the pediatrician that she was happy being a mother but was

_____

[3]     Father's calendar indicated that S.F. was at his home on the following dates: December 21-23, 25-27; January 2-3, 5-7, 16-20, 26-28; February 4-7, 22-24, 26-28; and March 4-8, 11-15, 20-22.

"suffering depression issues." However, Father never had any concerns about how Mother interacted with S.F.; Mother "seemed to be happy"; and they were "all together as a family." Mother testified she never saw S.F. acting like she was in pain on the occasions when Father brought her from the nursery into his bedroom for feeding.

At the time of S.F.'s February 21 pediatrician appointment, Father was concerned about S.F.'s "spit-up issues" and "heavy breathing," but the doctors told them nothing was wrong. Mother testified that at the time of this appointment, S.F.'s "spitting up" had increased "[a] little" and the reflux medication she was prescribed helped this condition. Paternal Great-grandmother was also concerned about S.F.'s health because of the spitting up and breathing problems and because her eyes looked like she did not "feel good." After the February pediatrician appointment, Paternal Great-grandmother helped the parents change S.F.'s health plan so she could have a new pediatrician, and they had been expecting to have an appointment with a new doctor in April.

Father testified that on the afternoon of March 11 when Mother and S.F. arrived at his house, Mother told him she had seen a bit of blood in S.F.'s diaper. Later that same day, Father saw blood in her diaper. Father was a "little concerned" and the parents decided to wait and observe S.F. because she did not appear to be in pain and was acting normally. Father saw no more blood during the next three and one-half days that S.F. stayed at his house.

Father provided additional details about what occurred in the hours before S.F. was brought to the emergency room on March 22. Father testified the morning of March

when he picked S.F. up in the nursery and removed her diaper, she went into a "breathing episode" and her eyes were "staring off." He placed her in a "burping position" on his chest, and Mother (who had joined him in the room) said "do something." Father placed "a very firm hand" on S.F.'s backside; patted her; and then applied more force by hitting her instead of patting her. Father was in a panic, and he used what he described as "excessive force" because S.F. was not responding normally. After about 15 to 20 pats or hits, S.F. urinated and defecated on him, opened her eyes, and cried.

Father testified that he was concerned because of this incident and her "spit-up" issues. However, Father and Mother decided to observe S.F. but not take her to the emergency room because she had been to the doctor numerous times, and Mother had just taken her on March 17 to the emergency room where she was fully examined, determined to be fine, and again diagnosed with the reflux condition. S.F. appeared lethargic, did not want to eat, and took a nap. About one hour later she was playful and normal. However, she only drank about two ounces from her bottle, and then vomited. Thereafter she had another episode of heavy breathing with no eye contact, and Father again applied force to her back. They then decided to give her the reflux medication she had been prescribed; it appeared to work because she ate again and had no more episodes. S.F. slept with Mother and Father that night. The next morning while Father was in the bathroom, Mother called for him and he ran into his bedroom. Mother was holding S.F.; there was blood and vomit coming from S.F.'s mouth; and S.F. was not making eye

12

contact. Father took her and again applied "a firm hand," but was unable to "snap her out of it this time." The parents then took her to the emergency room.

Father acknowledged that he was negligent when he did not take S.F. to the hospital on March 21, and that he caused the bruising on her back and buttocks area. However, he claimed that he never squeezed her in the chest area excessively and his handling of her was otherwise "gentle and appropriate." Paternal Great-grandmother, who witnessed the second incident on March 21, agreed that Father used more pressure than usual when S.F. appeared to stop breathing, but his conduct was not alarming.

C. *Additional Testimony*

Social worker Shari Medeiros opined that one parent inflicted the injuries to S.F. and the other parent knew about the abuse and failed to protect her. Medeiros noted the parents were the primary caretakers, and on March 21 the parents knew S.F. was not breathing or was nonresponsive and yet they decided to wait and not take her to the doctor. She opined that reunification services should not be provided because she did not think services would prevent the abuse from recurring.

Psychologist Robert Kelin, called by Father, testified that psychological testing raised no concerns that Father had a propensity towards violence. However, Dr. Kelin was somewhat concerned that Father decided not to take S.F. to the emergency room when she was symptomatic on March 21. When Dr. Kelin asked Father what he wanted to see happen at the hearing, Father responded he would like S.F. back in his care; however, "[u]nderstanding the circumstances of the injuries and all of the accusations, he

13

knew that was not going to happen"; and he wanted the investigation to continue. Given the severity of S.F.'s injuries and lack of information about their cause, Dr. Kelin concluded that "caution must be taken to protect" her, and recommended that Father continue with supervised visitation and receive reunification services. He testified he did not know whether Father abused S.F., but he opined Father was not "in denial about [S.F.'s] problems" and Father was fully "capable of benefiting from services."

S.F.'s current caretaker (Paternal step-grandmother) testified that S.F. has incurred no injuries since being placed in her care.

### III. *Trial Court's Rulings*

#### A. *Findings at Jurisdictional Hearing*

At the conclusion of the jurisdictional hearing, the court concluded that the expert testimony showed S.F.'s multiple rib fractures were likely the result of compression and her subdural hematomas were likely caused by some form of shaking. The court assessed the "swaddling" efforts made by the parents, done improperly, could have resulted in both compression and shaking. The court stated it was more likely than not that the injuries occurred during the caretaking by one or both of the parents, and it could not determine which parent committed the abuse, although it suspected it may have been Mother. Based on this conclusion, the court found true the section 300(e) abuse allegation against both parents, but emphasized that its section 300(e) abuse finding was based on a preponderance of the evidence, and it could not reach this finding by clear and convincing evidence.

The court then amended the petition to add a section 300(b) failure-to-protect count. The court found this second count true by clear and convincing evidence "based on the same factual averments" as the section 300(e) abuse count.[4]

### B. *Denial of Reunification Services at Dispositional Hearing*

At the conclusion of the dispositional hearing, the court denied reunification services to the parents pursuant to section 361.5, and set a section 366.26 permanency planning hearing. In support of the denial of reunification services, the court stated it was finding "by clear and convincing evidence" that S.F. had been adjudicated a dependent "as a result of the infliction of severe physical harm, and that the court found earlier that harm was caused by the parents." Further, the court found there was no evidence presented that it would be in S.F.'s best interests to provide reunification services.

### IV. *The Writ Petition*

In the writ of mandate proceeding before us, Father challenges the section 300(e) abuse finding as to him, and both parents challenge the denial of reunification services. The parents do not challenge the section 300(b) failure-to-protect finding. We issued an order to show cause, the Agency responded, and the parties waived oral argument.

---

[4]    We note that the written section 300(b) allegation added by the court actually tracks the language of section 300(a), which concerns harm inflicted by a parent, not failure to protect. However, when this discrepancy was pointed out by the Agency's counsel, the court added failure-to-protect language to the written second count. It is clear from the record that the allegation and true finding on the second count are based on section 300(b) failure to protect.

DISCUSSION

## I. *True Finding for Section 300(e) Abuse as to Father*

Father contends there is insufficient evidence to sustain the court's section 300(e) abuse finding as to him. Mother does not challenge this finding.

When reviewing a challenge to the sufficiency of the evidence, we consider the entire record, view the evidence in the light most favorable to the judgment, and indulge in all reasonable inferences that support the judgment. (*In re L.K.* (2011) 199 Cal.App.4th 1438, 1446; *In re Joshua H.* (1993) 13 Cal.App.4th 1718, 1728.) " '[A]ll conflicts are to be resolved in favor of the prevailing party, and issues of fact and credibility are questions for the trier of fact.' " (*In re E.B.* (2010) 184 Cal.App.4th 568, 575.) If the circumstances reasonably support the trier of fact's findings, reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding. (*In re L.K., supra*, 199 Cal.App.4th at p. 1446.)

Section 300(e) provides for dependency court jurisdiction when: "The child is under the age of five years and has suffered severe physical abuse by a parent, or by any person known by the parent, if the parent knew or reasonably should have known that the person was physically abusing the child." The jurisdictional finding may be made by a preponderance of the evidence. (§ 355(a); *In re A.S.* (2011) 202 Cal.App.4th 237, 244.)

A section 300(e) abuse finding may be based on circumstantial evidence showing that the parents knew or reasonably should have known about the abuse, even when it cannot be determined which caretaker inflicted the abuse. (See *In re E.H.* (2003) 108

16

Cal.App.4th 659, 670.) Drawing all reasonable inferences in favor of the court's ruling, the circumstances support that Father either committed or was in a position to know about the abuse.[5]

There is no dispute that S.F.'s injuries were not accidental. In determining who was responsible, the court could consider that Mother and Father were S.F.'s primary caretakers; they were new parents taking care of their first child; and the only other caretakers (Maternal Grandparents and Paternal Great-grandmother) were older and had raised children apparently with no abuse allegations. Further, the court could have questioned Father's and Mother's credibility given their failure to seek medical assistance on March 21 even though during two episodes on that date S.F. displayed highly alarming symptoms related to her breathing and responsiveness. The court could reasonably infer that if the parents had a clear conscience, the fact that S.F. had just been to the emergency room on March 17 would have compelled them not to delay, but to *immediately* seek medical help when dramatic symptoms emerged four days later. In other words, if they were truly unaware that S.F. was being abused, the traumatic episodes on March 21 would have increased their alarm, not caused them to merely wait and observe.

---

[5]     When finding the section 300(e) abuse allegation true for both parents, the court did not mention the component of the statute which allows jurisdiction to be taken when the parent knew or should have known about the abuse. Nevertheless, counsel cited this aspect of the statute during arguments before the court; we presume the court is aware of the relevant law (*People v. Mack* (1986) 178 Cal.App.3d 1026, 1032); and on appeal we imply findings that reasonably support the ruling (*SFPP v. Burlington Northern & Santa Fe Ry. Co.* (2004) 121 Cal.App.4th 452, 462).

Also, the juvenile court was not required to accept the visitations calendared by Father as conclusive evidence showing he could not have inflicted or learned about the abuse. First, the trial court was entitled to conclude that Father's claim that he took photographs of S.F. each time she was at his house did not establish a full and accurate record of his contact with her. For example, the record shows Father accompanied Mother to the February 21 pediatrician visit, and yet Father's calendar excludes this date. Second, the experts' estimations of the dates of the injuries were not so precise as to firmly rule out that Father was present when the abuse occurred. According to the experts, the first subdural hematoma could have occurred around the time of the February 21 pediatrician visit when S.F. was vomiting. According to Father's chart, he was with S.F. on February 4 through 7, and not with her from February 8 through 21. However, Dr. Kuelbs acknowledged she could not definitely state that the February 21 symptoms were the result of a head injury rather than reflux disease, nor could she pinpoint precisely when any head injury occurred before the February 21 visit. Third, the experts' estimates of the possible timeframes for the rib fractures contained dates that overlapped with some of the visitation dates calendared by Father.[6]

Moreover, the record reflects that Mother and Father spent considerable time together jointly caring for S.F. The record shows that Mother alternated between her home and Father's home on a regular basis; that she frequently spent the night with

---

[6] For example, Dr. Grogan's estimate that the rib fractures occurred 10 to 14 days before March 22 overlapped with Father's calendared visits on March 8, 11 and 12. Dr. Nunes's estimate that the rib fractures occurred seven to 21 days before March 22 overlapped with Father's calendared visits on March 4 through 8 and 11 through 15.

18

Father; and that both parents participated in feeding and diapering S.F. The court could reasonably infer that the frequency of Father's contact with S.F. and Mother and his hands-on participation in S.F.'s care gave him a substantial opportunity to either commit the abuse or become aware that the abuse was occurring.

Further, contrary to Father's suggestion, the court's abuse finding is not defeated by the experts' testimony that S.F.'s injuries were not likely observable unless the person committed or witnessed the abuse. As stated, the record supports that Father was an actual perpetrator or in a position to find out about the abuse, which establishes the requisite knowledge of the abuse notwithstanding that S.F.'s symptoms might not otherwise trigger abuse concerns.

In short, the court could reasonably conclude that it was more likely than not that Father either inflicted, knew about, or should have known about the abuse because he was S.F.'s primary caretaker along with Mother; Father and Mother spent a significant amount of time jointly caring for S.F.; it was unlikely that S.F.'s other caretakers (her grandparents and great-grandmother) inflicted the abuse; there was no definitive evidence establishing that Father was not present when the abuse occurred; and Father evinced a consciousness of guilt when he delayed bringing S.F. to the emergency room on March 21 in the face of alarming symptoms.[7]

---

[7] With respect to the contrary conclusion reached by the dissent, we agree that when an appellant challenges the sufficiency of the evidence, the reviewing court considers the entire record. However, where substantial evidence, including reasonable inferences drawn from the evidence, supports the trial court's factual finding, an affirmance is appropriate. The fact that contrary evidence exists which could support a different

19

## II. *Denial of Reunification Services*

The parents argue the court erred in denying reunification services. We agree. As we shall explain, the court's section 300(e) abuse finding by a preponderance of the evidence does not satisfy the clear and convincing evidence showing required for denial of services under section 361.5(b)(5). Further, the court's section 300(b) failure-to-protect finding by clear and convincing evidence cannot, on this record, reasonably encompass a clear and convincing showing of infliction of severe physical harm required for denial of services under section 361.5(b)(6) because the severe-physical-harm finding was based on the same facts as the section 300(e) abuse finding.

### A. *Statutes Governing Bypass of Reunification Services*

Section 361.5(b) provides that reunification services "need not be provided to a parent or guardian . . . when the court finds, by *clear and convincing evidence*, any of the following . . . ." (Italics added.) The statute then sets forth a list of circumstances that qualify for denial of services. (§ 361.5(b)(1)-(16).) Here, the court cited subdivision (b)(5) and (b)(6) of section 361.5 to deny services.

Section 361.5(b)(5) permits the denial of reunification services when the "child was brought within the jurisdiction of the court under *subdivision (e) of Section 300* because of the conduct of that parent or guardian." (Italics added.) Thus, section

---

finding is not the test. In our view, the dissent relies on evidence that supports a conclusion the trier of fact *could have* reached, without regard to evidence that supports the conclusion reached by the trial court here. As an appellate court, we cannot substitute our judgment for that of the trier of fact when the latter is supported by substantial evidence. (*In re E.B., supra*, 184 Cal.App.4th at p. 578.)

361.5(b)(5) concerns denial of reunification services in cases involving section 300(e) abuse to a child under age five.  (See *In re Joshua H., supra*, 13 Cal.App.4th at pp. 1731-1732 [§ 361.5(b)(5) applies to § 300(e) finding for parent who committed, or knew or reasonably should have known about, abuse].)  Further, the statute provides that when section 361.5(b)(5) applies, the court shall not order reunification services unless it finds that the services "are likely to prevent reabuse or continued neglect of the child or that failure to try reunification will be detrimental to the child because the child is closely and positively attached to the parent."  (§ 361.5(c).)

Section 361.5(b)(6) permits denial of services when the "child has been adjudicated a dependent pursuant to *any subdivision of Section 300 as a result of . . . the infliction of severe physical harm* to the child . . . *by a parent* or guardian . . . and the court makes a factual finding that it would not benefit the child to pursue reunification services with the offending parent or guardian."  (Italics added.)  Thus, section 361.5(b)(6) concerns denial of reunification services in cases involving any section 300 finding, and can apply to a section 300(b) failure-to-protect finding if the case concerns the infliction of severe physical harm by a parent.  Section 361.5(b)(6) defines infliction of severe physical harm as including, but not limited to, "*deliberate and serious injury* inflicted to or on a child's body . . . *by an act or omission of the parent* or guardian, or of another individual or animal *with the consent of the parent* or guardian . . . ."  (Italics added.)  When the court denies services under section 361.5(b)(6), the court must "read into the record the basis for a finding of . . . the infliction of severe physical harm . . . ."

21

(§ 361.5(k).) The statute also provides that when section 361.5(b)(6) applies, the court shall not order reunification services unless it finds "by clear and convincing evidence, that reunification is in the best interest of the child." (§ 361.5(c).)

B. *Trial Court's Explanation of its Rulings Based on Sections 361.5(b)(5) and (b)(6)*

When denying reunification services, the court relied on section 361.5(b)(5) based on its section 300(e) abuse finding, and on section 361.5(b)(6) based on its section 300(b) failure-to-protect finding.[8] The court stated section 361.5(b)(5) applied because the existence of the section 300(e) abuse finding was established by clear and convincing evidence. Further, the court stated section 361.5(b)(6) applied because it found by clear and convincing evidence that S.F. was adjudicated a dependent "pursuant to any subdivision [of section] 300" and "she was found so as a result of the infliction of severe physical harm, and that the court found earlier that harm was caused by the parents."[9]

C. *Analysis*

Although jurisdictional findings can be established by a preponderance of the evidence, the denial of reunification services requires clear and convincing evidence. (§ 361.5(b); *In re Ethan C.* (2012) 54 Cal.4th 610, 616-617, 626; *Tyrone W. v. Superior*

---

[8] We note the court's minute order states it was denying reunification services under section 361.5(b)(5), and erroneously omits the court's explicit reliance on section 361.5(b)(6) at the disposition hearing.

[9] When making its ruling under section 361.5(b)(6), the court did not expressly cite its section 300(b) failure-to-protect finding as the basis for this ruling. However, it is apparent from the record that the section 300(b) failure-to-protect finding underlies the section 361.5(b)(6) ruling since this is the only count that was found by clear and convincing evidence at the jurisdictional hearing.

*Court* (2007) 151 Cal.App.4th 839, 846; *Raymond C. v. Superior Court* (1997) 55 Cal.App.4th 159, 164.)

Here, the court affirmatively stated that it could *not* make its section 300(e) abuse finding by clear and convincing evidence and that the record supported the finding only by a preponderance of the evidence. Because the court's section 300(e) abuse finding was made only by a preponderance of the evidence, it cannot support the court's denial of reunification services under section 361.5(b)(5).

Further, although the court found the section 300(b) failure-to-protect allegation true by clear and convincing evidence, under the particular circumstances of this case the finding cannot reasonably be construed as encompassing a showing of infliction of severe physical harm by clear and convincing evidence that is required for denial of services under section 361.5(b)(6). The failure-to-protect statute allows for a jurisdictional finding when the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child . . . ." (§ 300(b); see *In re A.S., supra*, 202 Cal.App.4th at p. 246 ["The evidence supports a reasonable inference that one of the caretakers injured [child], and concomitantly, a reasonable inference that [child] was at substantial risk of serious physical harm . . . in the parents' home as a result of their failure or inability to adequately protect her."].) In contrast, section 361.5(b)(6) allows for denial of reunification services upon a showing of "*infliction of serious physical harm . . . by a parent*," which can be based on a finding of "*deliberate and*

23

*serious injury . . . by an act or omission of the parent . . . , or of another individual . . . with the consent of the parent . . . .*" (Italics added.) It is apparent that the infliction-of-harm language used in the reunification bypass provision is *much more narrowly tailored* than the broad failure-to-protect language of section 300(b), which reflects that a failure-to-protect finding does not necessarily equate with an infliction-of-harm finding for purposes of denying reunification services.

Because failure to protect may not always constitute infliction of harm to trigger the reunification bypass statute, it follows that a failure-to-protect finding based on clear and convincing evidence does not *automatically* translate into an infliction-of-harm finding by clear and convincing evidence. (See, e.g., *Pablo S. v. Superior Court* (2002) 98 Cal.App.4th 292, 301 [discussing facts supporting that failure to protect rose to the level of infliction of serious injury by omission under section 361.5(b)(6)]; see also *Tyrone W. v. Superior Court, supra*, 151 Cal.App.4th at pp. 851-852 [reunification services may be denied under section 361.5(b)(6) if parent had actual knowledge of abuse].) Reflective of the distinct nature of the infliction-of-harm requirement, section 361.5(k) requires the court to "read into the record the basis for a finding of . . . the infliction of severe physical harm . . . ." when denying services under section 361.5(b)(6). (See *In re Rebekah R*. (1994) 27 Cal.App.4th 1638, 1651 [court should set forth separate finding supporting application of section 361.5(b)(6) notwithstanding jurisdictional finding on same issue].)

When denying reunification services, the court apparently recognized the need to explain why its finding of failure to protect constituted infliction of severe physical harm within the meaning of section 361.5(b)(6). The court explained that its section 300(b) failure-to-protect ruling was based on its finding that the "infliction of severe physical harm . . . was caused by the parents." Thus, in this case, the court's section 361.5(b)(6) finding that the parents' act, omission, or consent caused the harm is supported by the *same facts* underlying the section 300(e) abuse finding—i.e., that each parent was responsible for S.F.'s injuries because the parent either committed the abuse or was in a position to know about the other parent's abuse. Consistent with this, the court stated at the jurisdictional hearing that the section 300(b) failure-to-protect finding was based on the "same basic factual averments" as the section 300(e) abuse finding.

Because the court expressly confined its section 300(e) abuse finding to a preponderance of the evidence and the section 361.5(b)(6) infliction-of-harm finding was derived from the same facts, we cannot reasonably construe the record as meeting the clear and convincing requirement for denial of reunification services.

We reject the Agency's contention (which was adopted by the juvenile court) that a section 300(e) abuse finding *automatically* triggers the section 361.5(b)(5) reunification bypass provision, even when the facts underlying the section 300(e) abuse finding were proven only by a preponderance of the evidence. The Agency contends, and the court ruled, that the mere *existence* of the section 300(e) abuse finding satisfied the clear and

25

convincing standard for application of the section 361.5(b)(5) bypass statute. We find this interpretation of the statute unpersuasive.

When interpreting a statute, we consider the statutory scheme as a whole, and construe the language in a commonsense manner and with the goal of effectuating legislative intent. (*Watershed Enforcers v. Department of Water Resources* (2010) 185 Cal.App.4th 969, 978-979.) The relevant language in section 361.5 states: "(b) Reunification services need not be provided to a parent or guardian described in this subdivision when the court finds, by clear and convincing evidence, any of the following: [¶] . . . (5) That the child was brought within the jurisdiction of the court under subdivision (e) of Section 300 because of the conduct of that parent or guardian." The Agency argues that the clear and convincing evidence requirement applies only to the fact that the court made a section 300(e) abuse finding, and not to the facts underlying the finding. When viewing the statutory language in the context of the entire statutory scheme and the expressed legislative intent, we do not find the Agency's interpretation persuasive.

When a court has made a section 300(e) abuse finding at the jurisdictional phase, the mere fact of its *existence* will be apparent at the dispositional phase simply because the section 300(e) ruling is part of the record. It serves no purpose to impose a clear and convincing evidence requirement on the existence of a finding that is obviously part of the record. Further, the broad reference to a clear and convincing evidence standard in the introductory sentence of section 361.5(b) reflects a legislative intent to condition

26

denial of reunification services on a heightened level of proof beyond the preponderance of the evidence standard applicable to jurisdictional findings. To effectuate the Legislature's expressed intent to require proof by clear and convincing evidence before denying reunification services, we conclude the court must find that the *facts* establishing the section 300(e) abuse finding were clearly and convincingly proven.

The Agency's citation to *In re Troy Z.* (1992) 3 Cal.4th 1170 does not support its contention that a section 300(e) abuse finding automatically triggers application of the section 361.5(b)(5) bypass provision. The *Troy Z.* court merely stated in general fashion that a juvenile court is directed not to provide reunification services if jurisdiction is based on section 300(e), and it did not mention or discuss whether the section 300(e) finding must be based on clear and convincing evidence. (*Troy Z., supra*, at p. 1174.)[10]

Because the clear and convincing evidence requirement was not satisfied, the court's decision to bypass reunification services cannot be sustained.

DISPOSITION

Father's petition is denied as to his challenge to the court's jurisdictional finding under section 300(e). The petitions are granted as to the denial of reunification services. The stay issued on January 9, 2014, is vacated. The juvenile court is directed to vacate its order setting a section 366.26 hearing and to order the Agency to offer reunification services to Mother and Father.

---

[10]    In *Troy*, the court held the parents' no contest plea to a section 300(e) allegation barred an appellate challenge claiming their conduct did not fall within section 300(e). (*In re Troy Z., supra*, 3 Cal.4th at pp. 1172, 1179-1180.)

27

HALLER, J.

I CONCUR:


HUFFMAN, Acting P. J.

MCINTYRE, J., concurring and dissenting.

I agree with the majority's conclusion the juvenile court erred in denying reunification services under section Welfare and Institutions Code section 361.5, subdivision (b)(5) and (6), and join in Part II of the opinion. (Undesignated statutory references are to the Welfare & Institutions Code.) I respectfully dissent from the majority's conclusion there is substantial evidence to support a jurisdiction finding under section 300, subdivision (e) as to K.F.

Where the identity of perpetrator cannot be established, a jurisdictional finding under section 300, subdivision (e) may be sustained where the child was constantly in the custody of his or her parents. (*L.Z. v. Superior Court* (2010) 188 Cal.App.4th 1285, 1293 citing *In re E.H.* (2003) 108 Cal.App.4th 659 (*E.H.*).) The majority applies this holding to a parent whose child was not constantly in his care and who had other caregivers during the entire period in which her injuries were likely to have been inflicted. In view of the entire record, I do not believe a trier of fact could reasonably conclude that K.F. physically abused his daughter, or knew or reasonably should have known that a person was physically abusing her. (§ 300, subd. (e).)

In *E.H.*, the reviewing court concluded there was substantial circumstantial evidence to show that the parents seriously physically abused their three-month-old baby or reasonably should have known she was being physically abused by a member of their household. The baby was never out of the parents' custody and remained with a family member at all times. The baby slept on the floor near a bed occupied by a blind,

developmentally disabled adult who habitually rolled out of bed and dragged herself around the apartment, the baby cried whenever she was handled and the parents did not follow up on the baby's diagnosis of colic.  (*E.H.*, *supra*, 108 Cal.App.4th at pp. 669-670.)

Here, the parents lived in separate households.  S.F. was not in her father's custody at all times.  The record belies the majority's assertion K.F. was in a position to find out about the abuse.  He did not live with the maternal grandparents.  There is no reason to assume K.F. knew all the people who lived at the maternal grandparents' home, their histories or behaviors, or any potential hazards at that home.  (The majority omits evidence showing that an uncle, who had a history of crime and violence, his girlfriend, and two male cousins, also lived or stayed in the maternal grandparents' home.)  On this record, the juvenile court could not draw a reasonable inference that K.F. was responsible for the abuse.  (*E.H.*, *supra*, 108 Cal.App.4th at pp. 669-670 [where a perpetrator cannot be identified, the trier of fact can reasonably infer the parents were responsible for the abuse when the child was constantly in the parents' custody during the time the injuries were inflicted].)  Further, there is no substantial evidence to show that a trier of fact could conclude that K.F. severely physically abused his child or "reasonably should have known that the person was physically abusing the child."  (§ 300, subd. (e).)

In examining the record for substantial evidence, we do not limit our review to the evidence favorable to the respondent.  (*People v. Johnson* (1980) 26 Cal.3d 557, 576 (*Johnson*).)  " 'It is not enough [to] simply . . . point to "some" evidence supporting the

2

finding," because not every piece of evidence " ' "remains substantial in the light of other facts." ' " (*Id*. at p. 577.) According to the pediatric child abuse experts, it was medically reasonable to believe that S.F.'s irritability, vomiting, and changes in behavior and sleep patterns were caused by a viral illness or reflux. A parent who did not know about the abuse would notice only that the baby was fussy. S.F.'s elbow fracture would not necessarily have been apparent because a three-month-old would not put any pressure on the injured area. S.F.'s rib fractures would not have been obvious, particularly to a first-time parent.

The majority's view the juvenile court could consider the *absence* of "definitive evidence establishing that Father was not present when the abuse occurred" shifts the burden from the agency to prove its case to the parent to disprove it. (Maj. opn., Discussion, part 1, at p. 18.) Further, contrary to the majority's view, the record supports K.F.'s argument his daughter was not in his care during the time some of her injuries were inflicted.

According to the testimony of the medical experts, the first subdural hematoma likely occurred in mid-February when the parents reported symptoms of vomiting and irritability. The record indicates S.F. was not in K.F.'s care from February 8 to February 21. S.F. was in her mother's care during this period, with help from the maternal grandparents, except from February 14 to 16, when the parents went to Catalina, leaving S.F. in the grandparents' care. S.F.'s elbow fracture was three to five days old on

3

March 22, indicating it was inflicted on or about March 17 to 19. The record shows that K.F. did not have any contact with his daughter from March 16 to the evening of March 20. S.F. was distressed on March 17, prompting her mother to take her to the emergency room. The majority discredits K.F.'s timeline because it does not indicate he was present at S.F.'s pediatric visit on February 21. However, a review of the entire record shows that K.F.'s timeline was offered to show the days he cared for his daughter at his home. He also testified he took S.F. to her pediatric visits on January 7 and 21, and February 21.

The majority points out that K.F. cared for S.F. during the period of time in which her rib fractures were likely inflicted. I do not believe it is reasonable to infer K.F. was responsible for S.F.'s rib fractures when she was left alone with other caregivers during that time. The record lacks other evidence that would tend to corroborate an inference of abuse. K.F. was not an angry or violent person. He had no history of mental illness, crime, substance abuse or child protective referrals. He supported M.M. during her pregnancy, accompanied her to prenatal appointments, set up a nursery in his home and was present when S.F. was born. Unlike M.M., K.F. did not suffer from depression. Unlike M.M., who was awkward and uncomfortable with S.F., K.F. competently and lovingly cared for his daughter. She slept soundly at K.F.'s home, waking up only for regular feedings. By contrast, according to testimony from M.M. and the maternal grandparents, S.F. cried all night at M.M.'s home.

4

I disagree with the majority's view the trier of fact could reasonably conclude that K.F. "evinced a consciousness of guilt" when he delayed seeking medical care for S.F. on March 21. The majority's view is based on isolated evidence and disregards S.F.'s history of "good pediatric care" during the periods in which she likely sustained the majority of her injuries. The record shows that K.F. did not avoid seeking medical care for his daughter during that time. On March 21, he was advised by his grandmother, who was present during S.F.'s second incident of 30 to 40 seconds duration, merely to watch S.F. and take her to the doctor if she had another episode. According to his grandmother, S.F. appeared to be her "normal, little . . . self" the rest of the day. The following morning, when S.F. was in distress, K.F. immediately brought her to the hospital. Viewed in the context of the record as a whole, there is no reasonable evidence to support a finding that K.F. avoided seeking medical care for his child because he physically abused his daughter or knew she was being physically abused. (*People v. Johnson*, *supra*, 26 Cal.3d at p. 576 [not every inference is reasonable in light of the entire record].)

I would not infer a parent was responsible for severe physical abuse where the identity of the perpetrator is unknown, the child was not constantly in the care of that parent, and the child had other caregivers during the time the injuries were likely inflicted. Accordingly, I would reverse the jurisdictional finding under section 300, subdivision (e) as to the father. Although I concur with the majority's view the juvenile court erred when it denied reunification services under section 361.5, subdivision (b)(5)

5

and (6), in the absence of a jurisdictional finding under section 300, subdivision (e), the father would be statutorily entitled to reunification services.  (§ 361.5, subd. (a).)

McINTYRE, J.

6