Filed 7/21/25 D.A. v. Superior Court CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| D.A., | |
| Petitioner, | E086169 |
| v. | (Super.Ct.No. DPRI2500017) |
| THE SUPERIOR COURT OF RIVERSIDE COUNTY, | OPINION |
| Respondent; | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS; petition for extraordinary writ. Malvina Ovanezova, Temporary Judge. (Pursuant to Cal. Const., art. VI, § 21.) Petition denied.

Lynnell Harris for Petitioner.

No appearance for Respondent.

Minh C. Tran, County Counsel, Teresa K.B. Beecham and Prabhath Shettigar, Deputy County Counsel, for Real Party in Interest.

1

D.A. (Father) petitions for extraordinary writ review of an order setting a hearing under Welfare and Institutions Code section 366.26. (Unlabeled statutory citations are to this code.)

At the contested jurisdiction hearing, the juvenile court took jurisdiction over Father's infant daughter (M.A.) under section 300, subdivisions (b)(1) and (e). At the contested disposition hearing, the court removed M.A. from the parents' custody, bypassed the parents for reunification services, and set the section 366.26 hearing. Father challenges the sufficiency of the evidence supporting the jurisdictional findings and argues that the court erred by bypassing the parents for reunification services. We conclude that Father's arguments lack merit, and we accordingly deny the petition.

BACKGROUND

I.    *Detention hearing*

On January 11, 2025, Father and M.T. (Mother) brought three-week-old M.A. to Children's Hospital of Orange County (CHOC) when they noticed that her "leg was not moving." Hospital staff discovered that M.A. had multiple bone fractures, bruises, and abrasions. Father reported that he was awakened by M.A.'s crying, and he changed her diaper. Mother reported that Father woke her up because he thought that M.A.'s leg "looked weird."

When the social worker from the Riverside County Department of Public Social Services (DPSS) arrived at CHOC, a nurse told the social worker that the hospital had conducted a nonaccidental trauma workup, which included a bone survey. The survey showed that M.A. had a "'major left femur fracture'" and appeared to have "'corner fractures'" and a "'bucket-handle fracture'" of the tibia.

Dr. Vinod Rao, a board certified child abuse pediatrician, told the social worker and Riverside County investigators that M.A.'s laboratory workup did not reveal any medical concerns that could cause M.A.'s fractures and that he would order genetic testing to rule out any other possible causes "as a formality." Dr. Rao said that it was unusual for newborns to suffer from femur fractures, because infants are nonambulatory. He also said that the parents' explanation was "inconsistent with the mechanism of the injury." Dr. Rao explained that M.A.'s "corner fractures and bucket-handle fractures" were caused by "to-and-from manipulation (shaking)."

An investigator explained to Dr. Rao that the parents thought one of them could have rolled onto M.A. while they were co-sleeping. Dr. Rao said that "the parents rolling onto [M.A.] would not explain any of [her] injuries" and that her injuries were consistent with child abuse. The investigator also told Dr. Rao that Father said that "he would apply pressure to [M.A.'s] shins to relieve the gas pressure" and that he thought he may have pressed too hard. Dr. Rao opined that "at this time it was deemed as [c]hild [p]hysical [a]buse," and he "anticipated providing law enforcement and [DPSS] with his final report in the upcoming weeks."

3

When DPSS met with the parents, Mother told the social worker that she did not know how M.A. sustained her injuries. Mother described their daily routine and said that she and Father would "take turn[s] caring for" M.A. Mother said that Father "was used to working a graveyard shift," and he stayed up at night caring for M.A. while Mother slept. On January 10, 2025, she and Father stayed up late watching movies, and they cared for M.A. together. Mother changed M.A.'s diaper around 8:00 p.m. but did not see any injuries, and Father put M.A. to bed. The parents went to bed between 11:00 p.m. and 12:00 a.m.

A few hours later, M.A. woke up crying. Mother fed and soothed her and brought her into the parents' bed because Mother "'did not want to get up again to change her.'" Mother said that 10 minutes later, M.A. again woke up crying. Mother woke Father to change M.A.'s diaper. Father showed Mother that M.A.'s left leg was "'floppy.'" The parents took her to the emergency room because M.A.'s left leg was not bending, and "she cried more when the left leg was moved."

Mother said that she had not seen any bruising on M.A. until after they arrived at the hospital. Mother described the bruises as circular and purple, and one bruise was the size of a fingerprint. Mother had no explanation for M.A.'s injuries, and she said that she and Father were "deep sleepers." Mother said that Father was a "large person," and "'I guess [M.A.] got hurt how [law enforcement] said. We rolled on her.'" Mother denied having any complications during birth, and she denied having any mental health, medical, or genetic concerns.

4

The social worker met with Father at the parents' home. Father said that he did not know how M.A. was injured. He said that he is a deep sleeper and uses a breathing medical device. He described the family's daily routine, and he said that no one else had cared for M.A. Father denied seeing any signs of bruising on M.A. on January 10, 2025. He said that he heard M.A. crying, but he did not fully wake up because Mother was caring for her. He said that Mother woke him at about 5:00 a.m. to change M.A.'s diaper, and he rolled over to pick M.A. up and noticed that her left leg "had no movement." He said that M.A. would cry more when her leg was moved, and when he showed Mother, they decided to take M.A. to CHOC. Father denied that there were any complications during M.A.'s birth, and he denied having genetic or mental health concerns.

On January 14, 2025, DPSS filed a petition alleging dependency jurisdiction under subdivisions (a), (b)(1), and (e) of section 300. The petition alleged that M.A. was physically abused while in the parents' care and custody, which resulted in a broken left femur and bruising and abrasions to her lower extremities. The petition alleged that the injuries were "of a nature as would ordinarily not be sustained except as a result of the unreasonable, or neglectful acts or omissions, of either parent."

On January 15, 2025, the juvenile court held a detention hearing. The court detained M.A. and ordered supervised visitation for both parents.

5

II.     *Jurisdiction hearing*

When interviewed for the jurisdiction and disposition report, Mother reported that "'[t]here was no shaking. None of it is true." Mother said that she believed that swaddling could have caused M.A.'s injuries, or they could have been caused when the parents tried "'to release gas where we scrunch up her legs to her belly button and letting it go or the co-sleeping.'" Father told the social worker that he did not know how M.A. was injured and that when he woke up around 5:00 a.m. or 6:00 a.m., she was crying and "'her leg was limp and dangling.'" Father said that he thought they "'probably rolled over her legs as she was laying in between us.'"

DPSS's report included an email from Dr. Rao, which explained that he had "reviewed the video reenactment" of Father releasing M.A.'s gas. Dr. Rao opined that "[w]hat the biological father is demonstrating in the video would not be plausible to cause or contribute to the injuries and there was not anything in the scene photographs that I observed that would plausibly cause or contribute to the injuries."

DPSS also attached Dr. Rao's report, which explained that M.A. had a mid-shaft left femur fracture, a classic metaphyseal left femur fracture, and a classic metaphyseal right tibia fracture. There were also multiple bruises on both of her legs. Dr. Rao opined that "[b]ased on the information currently available, [M.A.'s] presentation and injuries are at this time highly concerning for inflicted injury and child physical abuse, and considering the differential diagnosis for [M.A.'s] presentation, inflicted injury and child physical abuse are more likely the cause of the injuries as compared with the histories

6

provided to date or other potential alternatives." Dr. Rao explained that "[i]t would not be plausible for [M.A.] to sustain her injuries (bruising and/or fractures) during her own activities or through routine handling and care for a child of her age and development. Based on the information provided regarding the histories proposed of the parents co-sleeping with [M.A.] and [one] of the parents having rolled onto [M.A.] and/or the history proposed of how the biological father changes [M.A.'s] diaper and relieves gas by bending her legs up to her abdomen, those proposed histories are not plausible to explain the extent and distribution of injuries [M.A.] has been identified to have. Although [M.A.'s] medical evaluation is ongoing and laboratory studies remain pending, at this time there are no indications of a medical condition that would plausibly cause or contribute to the entirety of [M.A.'s] injuries; however, this author will follow-up regarding the pending testing results as well." Dr. Rao further opined that imaging of the mid-shaft femur fracture "indicate[d] that it occurred within the preceding 14 days and based on symptoms most likely occurred on or around the morning of the day of presentation to the hospital."

On January 30, 2025, Dr. Rao included an addendum to his report. He had reviewed the follow-up skeletal survey, additional radiographs, and laboratory results. He reported that M.A.'s femur fracture was acute at the time of the initial skeletal survey on January 11, 2025, and it demonstrated healing on January 27 and 29, 2025. He also reported that the fracture to M.A.'s right tibia showed signs of healing on January 27 compared to its appearance on the initial skeletal survey. Dr. Rao noted that testing for

7

osteogenesis imperfecta and laboratory studies were normal. He opined that M.A.'s injuries were caused by inflicted injury and child physical abuse and that "no other plausible alternative [had] been identified."

On the date originally set for the jurisdiction hearing, Mother's counsel asked the court to set a pretrial conference and a trial date. Counsel indicated that more time was needed to determine whether Mother would be hiring a medical expert. The court continued the hearing.

In an addendum report, DPSS reported that during Mother's interview, she told the social worker that the morning the parents took M.A. to the emergency room, M.A. "wasn't crying in pain, and there was nothing unusual about her behavior." "She was a bit fussier than usual, but nothing out of the ordinary. There was no shaking of her; I don't know anything about that. I just know that it was written in the last report." Father reported that M.A. was "a bit fussier than usual that day. The evening before, around 9:00pm, I had helped relieve [M.A.'s] gas by placing her on my lap and performing the leg movement to help release the gas. [¶] Around 5:00am-6:00am, I woke up to change her, and that is when I noticed that her leg appeared limp and was dangling. When I touched or moved her leg, I could tell she was in pain." He also reported that he was unsure why Mother placed M.A. in the bed with them, but he thought it was because she "had been crying more" that day. He also said that he did not "know anything about the shaking that was mentioned in the last report."

8

At the contested jurisdiction hearing, DPSS asked the court to sustain the petition and bypass the parents for reunification services. The parents did not call any witnesses, and they did not introduce any evidence. Mother's counsel argued that the allegations under subdivisions (a) and (e) of section 300 were not supported by sufficient evidence. Counsel argued that although DPSS presented medical evidence of M.A.'s injuries, the parents provided a plausible explanation and that Father's efforts to relieve M.A.'s gas was consistent with Dr. Rao's opinion that the injuries occurred from a "to and from" motion. Counsel also argued that DPSS's subdivision (a) allegation was "contradictory" to its subdivision (e) allegation and that the subdivision (e) allegation was not supported because there was no evidence to support an allegation that M.A. was abused by someone other than the parents.

Father's counsel joined Mother's arguments and argued that it was possible that the injuries could have been caused by a combination of Father's efforts to relieve M.A.'s gas and one of the parents rolling onto her.

The court struck the allegation under subdivision (a) of section 300 but found that the allegations under subdivisions (b)(1) and (e) of section 300 were true by a preponderance of the evidence. Mother's counsel asked the court to clarify whether it had found the allegations true by a preponderance of the evidence, and counsel requested that the court bifurcate the disposition hearing. The court confirmed that its finding was by a preponderance of the evidence and set a contested disposition hearing for May 2025.

9

III.    *Disposition hearing*

At the contested disposition hearing, DPSS's counsel argued that the parents should be bypassed for reunification services pursuant to section 361.5, subdivisions (b)(5) and (b)(6).

Neither of the parents called any witnesses, and they did not offer any evidence. Mother argued that because the parents were engaged in their case plan, having positive visits with M.A., and cooperating with DPSS, DPSS's opinion that the parents would not benefit from services was "inaccurate." Mother argued that Father's efforts to relieve M.A.'s gas were a plausible cause of M.A.'s injuries. Mother argued the evidence did not support the allegation that the parents knew or reasonably should have known "how the child's severe injuries were sustained" and that the bypass provisions did not apply to the parents because the court found the jurisdictional allegations true by a preponderance of the evidence.

Father's counsel argued that it was in M.A.'s best interest to order reunification services for Father. Counsel argued that the parents had participated in their case plan and "taken very careful attention to every instruction and information that has been given to them" "to prepare for a safe return of their child and to prepare for a safe home environment." Counsel contended that because the "[c]ourt found that there was no intentional injury to the child and acknowledging that Father and Mother have acknowledged that there was an injury to the child, for [DPSS] to say that there's no possibility that the parents would benefit from the services seems to be contradictory."

10

In announcing its ruling, the court noted that it had bifurcated the jurisdiction and disposition hearings. The court then stated, "I would make the finding and actually do make the finding by clear and convincing evidence that the child does come within" subdivision (e) of section 300. The court noted M.A.'s injuries and the continued lack of explanation provided by the parents. The court found that because the parents were the primary caregivers for M.A., they should have reasonably known that M.A. was being abused. The court then bypassed the parents for reunifications services, stating that "at this point, I do make the same finding under (b)(5) and (b)(6) under Welfare & Institutions Code 361.5."

Mother's counsel asked for clarification whether the court was "going back to jurisdiction and subsequently revising [its] ruling," to which the court responded, "No." The court clarified that "the allegations under subsection (e), I normally find them true by a preponderance of the evidence. For disposition purposes, I also find it true by clear and convincing evidence in order to get to the bypass provision." The court then set the section 366.26 hearing.

## DISCUSSION

I.      *Sufficiency of the evidence supporting the jurisdictional findings*

Father argues that the record does not contain substantial evidence to support the court's jurisdictional finding under subdivision (e) of section 300 (child under age five who has suffered severe physical abuse by a parent). We disagree.

11

A challenge to the sufficiency of the evidence supporting a jurisdictional finding requires us to determine whether substantial evidence, contradicted or not, supports it. (*In re I.J.* (2013) 56 Cal.4th 766, 773 (*I.J.*).) We review the record in the light most favorable to the court's determination and draw all reasonable inferences in support of it. (*Ibid.*) We do not reweigh the evidence or exercise independent judgment but merely determine whether the evidence is sufficient to support the finding. (*Ibid.*)

Father's argument fails because the record contains ample evidence supporting the juvenile court's finding of severe physical abuse. First, it is uncontested that M.A. was under five years old when she suffered several bone fractures including two left femur fractures a right tibia fracture, and she had bruises and abrasions to both of her legs.

Second, there was no evidence that M.A. suffered from any medical condition that might cause or contribute to her injuries. Dr. Rao reported that M.A.'s "testing for osteogenesis imperfecta was normal and did not identify any variants," and the laboratory studies for hematologic conditions were normal. The pediatric genetics department evaluated M.A. and likewise found no evidence of any condition that would explain the fractures.

Third, other than the parents' claims of accidentally injuring M.A., they did not introduce any evidence that her injuries were not caused by inflicted injury and child physical abuse. Neither of the parents called any witnesses to testify, and they did not present any medical evidence. Father maintains that there were plausible alternative explanations for M.A.'s injuries. But Dr. Rao opined that the alternative causes

12

suggested by the parents were not plausible explanations of M.A.'s injuries, and there was no contrary medical evidence. We do not reweigh the evidence on appeal. (*I.J.*, *supra*, 56 Cal.4th at p. 773.)

Fourth, the parents were the only individuals that could have caused M.A.'s injuries. Father said that no one had cared for M.A. other than himself and Mother.

For all of these reasons, we conclude that substantial evidence supports the court's jurisdictional finding.

II.     *Bypass of reunification services*

Father argues that the juvenile court erred by bypassing him for reunification services under subdivision (b)(5) of section 361.5 because the court "found jurisdiction on the [section 300, subdivision (e) allegation] only by a preponderance of the evidence." We disagree.

"Reunification services must be provided to the mother and statutorily presumed father of children who have been removed from their parents' custody, unless a statutory exception applies. [Citations.] The statutory exceptions are contained in subdivision (b) of section 361.5, which provides that '[r]eunification services need not be provided' if the court finds 'by clear and convincing evidence' that any of 17 enumerated bypass provisions apply." (*In re A.E.* (2019) 38 Cal.App.5th 1124, 1141.) Section 361.5, subdivision (b)(5), applies if the "child was brought within the jurisdiction of the court under subdivision (e) of section 300" because of the parents' conduct. Subdivision (b)(6) of the statute applies if (1) the child was adjudicated a dependent "as a result of . . . the

13

infliction of severe physical harm to the child, a sibling, or a half sibling by a parent," and (2) "it would not benefit the child to pursue reunification services with the offending parent." (§ 361.5, subd. (b)(6)(A).) If subdivision (b)(5) of section 361.5 applies, then the court "shall not order reunification" unless the court "finds that, based on competent evidence, those services are likely to prevent reabuse or continued neglect of the child or that failure to try reunification will be detrimental to the child because the child is closely and positively attached to that parent." (§ 361.5, subd. (c)(3).)

We review an order bypassing reunification services for substantial evidence (*Amber K. v. Superior Court* (2006) 146 Cal.App.4th 553, 561), taking into account the level of confidence that the "clear and convincing" evidence standard demands (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995).

Father's argument fails because the record affirmatively shows that the court did apply the clear and convincing evidence standard when it found at the disposition hearing that M.A. came under the jurisdiction of the court under subdivision (e) of section 300. At the bifurcated disposition hearing, the court stated: "I would make the finding and actually do make the finding by clear and convincing evidence that the child does come within" subdivision (e) of section 300. Father is correct that at the jurisdiction hearing, the court found that M.A. came within that subdivision by a preponderance of the evidence. But the court made the subsequent finding at the disposition hearing that M.A. came with subdivision (e) of section 300 by clear and convincing evidence, and that finding is supported by substantial evidence. It was uncontested that M.A. was under

14

five years old, and the evidence showed that the parents subjected her to severe physical abuse. The jurisdictional allegation under subdivision (e) of section 300 was supported by clear and convincing evidence, so the bypass finding under subdivision (b)(5) of section 361.5 was supported by clear and convincing evidence as well.

Father cites *K.F. v. Superior Court* (2014) 224 Cal.App.4th 1369 to support his position, but *K.F.* is distinguishable. In that case, the juvenile court found the allegation under subdivision (e) of section 300 true by a preponderance of the evidence at the jurisdiction hearing, and the court stated that it "could not reach this finding by clear and convincing evidence." (*K.F.*, *supra*, at p. 1380.) But at the disposition hearing, "the court stated it was finding [the subdivision (e) allegation true] 'by clear and convincing evidence.'" (*Id.* at p. 1381.) On appeal, the court held that because "the court affirmatively stated that it could *not* make its section 300(e) abuse finding by clear and convincing evidence and that the record supported the finding only by a preponderance of the evidence," the finding could not "support the court's denial of reunification services under section 361.5(b)(5)." (*Id.* at p. 1386.) As DPSS points out, the juvenile court in this case did not state at jurisdiction that it was unable to find the allegation under subdivision (e) of section 300 true by clear and convincing evidence; it merely made the finding by a preponderance of the evidence but left open whether the evidence was strong enough to meet a higher standard. Consequently, the court's finding by clear and convincing evidence at disposition did not contradict any of the court's findings or rulings at jurisdiction. *K.F.* therefore does not support Father's position.

15

Father also argues that the court erred by bypassing him for reunification services pursuant to subdivision (b)(6) of section 361.5. Any error concerning subdivision (b)(6) was harmless because, as we have already explained, the juvenile court's finding under subdivision (b)(5) was well supported, and "only one valid ground is necessary to support a juvenile court's decision to bypass a parent for reunification services." (*In re Madison S.* (2017) 15 Cal.App.5th 308, 324.)

DISPOSITION

The request for a stay is denied. The petition is denied.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
J.

We concur:

MILLER
Acting P. J.

RAPHAEL
J.

16