Filed 4/14/21  A.P. v. Super. Ct. CA1/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| A.P.,<br><br>　　　Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF HUMBOLDT COUNTY,<br><br>　　　Respondent;<br><br>HUMBOLDT COUNTY DEPARTMENT OF HEALTH AND HUMAND SERVICES et al.,<br><br>　　　Real Parties in Interest. | A162010<br><br>(Humboldt County<br>Super. Ct. No. JV20000043) |

　　　A.P. (father) and A.M. (mother) petition[1] this court for extraordinary writ review of a juvenile court order denying reunification services and setting a selection and implementation hearing under Welfare and Institutions Code section 366.26 for their son (minor).  Parents contend (a) the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1912 et seq.) applies and

---

[1]  Mother filed a joinder to father's petition on March 15, 2021.

1

(b) the court should have ordered reunification services.  We conclude the juvenile court did not err and deny the petition on the merits.

**BACKGROUND**

In February 2020, the Humboldt County Health and Human Services Department (Department) received a referral alleging physical abuse of the then six-month-old minor.  Father had called 911 "because something was wrong with [minor]."  Father "did not inform dispatch that the [minor] was not breathing," but when the fire department arrived, father reported he had "not been breathing for approximately fifteen minutes."  Minor had "agonal breathing"[2] and fire department personnel "administered CPR and used a rescue breath with a baby mask."  At the emergency room, minor was intubated and later flown to a children's hospital.

Minor was diagnosed with "bilateral retinal hemorrhages throughout all layers of the eyes (internal bleeding in the eye)," "bilateral subdural hematomas that are both old and new," "two subdural bleeds on both sides of the brain . . . consistent with old and new trauma," "[t]raumatic [b]rain [i]njury," "[r]espiratory [f]ailure," "[f]eeding [p]roblems," and "[g]astrotomy."  Additionally, he was "suffering from seizures."  Minor was "in critical condition and was still having multiple seizures."  His "retinol hemorrhaging and subdural hematomas [were] consistent with a shaken baby and were life threatening resulting from non-accidental trauma," with the seizures "likely secondary to [the] trauma."

Parents' account of minor's injuries were "not consistent with the injuries themselves" and parents were assertedly "unaware of how the child

---

[2] Agonal breathing "is often a symptom of a severe medical emergency, such as stroke or cardiac arrest and . . . the gasping associated with agonal breathing is not true breathing, but rather a brainstem reflex."

2

could have sustained the injuries that he has." On arriving at the scene, fire department personnel were let into the home by "an unknown male, who seemed to be a little concerned about [minor]." Father "was showing little or no emotion in regards to the [minor's] condition," while mother "had just woken up and appeared to be unaware of her surroundings and what was happening."

The Department filed a Welfare and Institutions Code section 300[3] petition alleging minor was at serious risk of physical harm (§ 300, subd. (a)), parents had failed to protect minor (§ 300, subd. (b)(1)), and minor had suffered severe physical abuse (§ 300, subd. (e)). The Judicial Council ICWA-010A form attached to the petition indicated minor "is or may be a member of or eligible for membership in a tribe" through both parents.

The court determined a prima facie showing had been made that minor came within section 300 and there was a need for continued detention because there was "a substantial danger to the physical health of the child," and ordered parents to complete a Judicial Council ICWA-020 Parental Notification of Indian Status form, ordered reunification services, and set the matter for a jurisdiction hearing.

The jurisdiction report noted parents were interviewed at the hospital. They claimed not to know how minor sustained his injuries. Father related that about a week before the incident, minor had a " 'lethargic spell,' " "could not hold his head up like he normally did," "could not hold his eyes open," and "looked visibly tired." Father and grandfather had been "playing with [minor] until he started making faces and getting fussy." Parents took minor to the emergency room and were told "it was a virus and to keep the child

---

[3] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

3

hydrated." Two days later, mother took minor to his primary care physician because she believed "he was having seizures." Parents were told to bring minor back to the hospital when they thought he was having a seizure so a doctor could assess the situation. Mother stated that four days before the incident, minor "woke up that morning and had visible blood veins in his eyes." Parents also said minor had "an episode of back arching that lasted for 10 minutes then he stopped crying and went limp." Minor had "fine tremors in his arms . . . and was not tracking with his eyes" but mother stated he was "acting normally" "between episodes." On the day before or day of the incident, mother stated minor's "eyes appeared very blood shot." Father had been playing with minor downstairs when father yelled for mother. Mother stated minor's "arms were shaking and he was very tired appearing." Minor "was not tracking with his eyes," he "stopped breathing and turned red," and "vomited three times." After the social worker explained minor's injuries, parents asked if he could have sustained his injuries from them "accidentally hitting [minor's] head on a door frame" or from when mother "bounced [minor] too hard."

The social worker also interviewed minor's nurse practitioner who opined minor's injuries were "consistent with non-accidental" trauma, that he sustained old and new injuries, and that the "first injury would have had to have happened a long time [*sic*] to get to its current state and could have happened months prior" while "the second injury appears to have occurred close to February 27." The nurse was of the opinion that "someone knew they were hurting the child and someone knew what they were doing to the child," and further that minor would have had "subtle signs and symptoms after the injuries took place that the parents would have noticed."

4

The Department attached minor's medical records detailing the severity of his injuries to an addendum report. Minor was then on medication to stop his seizures and had a new "internal shunt" (capitalization omitted) placed in his skull and "appear[ed] to be doing better."

A copy of the sheriff's office report was also attached. Parents told the sheriff's office they were the primary caregivers, but sometimes paternal uncles watched minor for "very short periods of time" or paternal grandfather would watch minor "for longer periods." Parents denied that they had ever "shaken" minor or "heard if anyone had ever shaken [minor]." Paternal grandfather and paternal uncles stated they had never seen minor being "intentionally shaken or struck." Although they had witnessed parents "get frustrated" with minor, they had never witnessed "any concerning or aggressive behavior from the frustration."

The Department sent out Judicial Council ICWA-030 notices to the tribes listed by parents (i.e., Bad River Band/Lake Superior of the Chippewa Tribe and Osage Tribe), as well as the Bureau of Indian Affairs and the Department of the Interior. By the time of a November 2020 addendum report, the Department had received notice father and minor were eligible for enrollment in the Osage Nation. Father and paternal grandmother "were working on getting him and [minor] enrolled." The Department had not yet received eligibility information regarding mother.

After many continuances, the court held the jurisdiction hearing in November 2020. The court reviewed and read the jurisdiction and addendum reports and at the hearing heard from Dr. James Crawford-Jakubiak, who testified as "an expert in the area of pediatrics, as well as medical evaluation of child abuse and neglect."

5

Dr. Crawford-Jakubiak had reviewed minor's records and was involved in minor's medical treatment.  In the "week and half or so prior to the catastrophic events of the 27th," minor "was seen by a variety of different providers . . . for a variety of different types of symptoms.  Some were . . . upper respiratory symptom-type things, and then others were more general, like lethargy or abnormal movements."  On the day of minor's hospitalization, he was admitted to the hospital in "critical condition," after having "what appeared to be a respiratory arrest at home."  Before being flown to a children's hospital, imaging studies were done.  The studies revealed minor had "fluid around his head" that appeared to be blood.  At the children's hospital, minor was "unresponsive, with seizures, on a ventilator."  Dr. Crawford-Jakubiak opined minor had "suffered severe physical abuse."  Minor had a traumatic brain injury, "very extensive retinal hemorrhages," a "vitreous hemorrhage" and just "really terrible bleeding in both of his eyes."  The bleeding was not visible by "somebody just looking at him," rather "you have to use special equipment that the eye doctors had to see the inside of the eyes."  Minor's symptoms were "nonspecific," and the doctor "would not have necessarily expected the parents, at least anyone who was not aware of what [minor] experienced, to have an independent concern of trauma . . . because, again, everything was on the inside of his body."

The "trauma to his head caused . . . injury to various organs at the same time.  It caused injuries to his brain, to the vessels around his brain, causing the bleeding, and to the structures of his left and his right eye."  To get rid of the fluid around his brain, minor had undergone "quite a few neurosurgical interventions," including several attempts at a peritoneal shunt and drains or holes "made through the head" where a "tube is placed" to collect the fluid.  In addition to the shunt, minor needed a feeding tube and

6

had "experienced quite a bit of what's called atrophy, which means brain loss due to injury," which would "manifest itself . . . over his lifetime." Particularly, the doctor was concerned about "developmental delays and . . . motor function."

The doctor surmised that "at a minimum [minor is] a child who has very serious traumatic brain injury" and that because of the "presence of new and old blood" on minor's MRI it appeared the injury had "happened on at least two occasions." The injury could have resulted from "shaking the baby" or "impact on a relatively soft surface" because there was no bruising on minor's skin. Several specialists besides Dr. Crawford-Jakubiak saw minor, including, but not limited to, trauma surgeons, neurosurgeons, ophthalmologists, hematologists, and all concluded trauma was the " 'likely explanation for [minor's] problems.' " While the doctor recalled from an interview with the parents that "there were multiple adults living in the household," he had no opinion on who caused minor's injury although he stated that whoever caused the injuries would have known they had occurred.

The court (Judge Feeny) found the evidence established that "both parents were with the child constantly, the household included [minor's] paternal grandfather and two young paternal uncles." The court then found by a preponderance of the evidence that minor's "parents reasonably should have known that someone in the household was physically abusing this child." The court determined the minor was a child described by section 300, subdivisions (a), (b) and (e) by a preponderance of the evidence and set the matter for a disposition hearing.

In the disposition report, the Department noted minor was out of the hospital and currently placed in a resource family approval home. Minor was

doing well and receiving physical and occupational therapy. The report recommended parents not be offered reunifications services under section 361.5, subdivisions (b)(5) and (b)(6)(A). In an addendum report, the Department stated ICWA did not apply. The Osage Nation had concluded that although minor was eligible for enrollment, he had not been enrolled nor was he the child of a member, since father had not enrolled in the tribe.

Almost a year after minor was removed, the juvenile court (Judge Hinrichs) held a contested disposition hearing. The court heard from the social worker for the Department regarding services and from father on his own behalf. After testimony, the court heard argument by counsel. Parents argued the court could not bypass services because the section 300, subdivision (e) jurisdictional finding for minor was made by a preponderance of the evidence, not by clear and convincing evidence. In response, the Department stated a jurisdictional finding by a preponderance of the evidence does not foreclose bypassing of services and urged the court to bypass family reunification services.

After taking the matter under submission, the following month, the court found by clear and convincing evidence the minor had been adjudicated a dependent as a result of severe physical harm by a parent, and ordered no reunification be provided to parents. In so doing, the court stated the "concern here is the parents are unable to give any explanation for injuries that occurred over a period of time. The Court believes that it's highly likely that one or probably both did or saw something to explain the multiple traumas this child sustained and are protecting themselves or others, rather than assist the Court in its decision today. The lack of transparency and desire to protect someone other than the child leads me to conclude that the

8

child is at continued risk of harm and that there really is no services that can be provided that could move us past that point."

The court also determined ICWA did not apply, noting the tribe had "not indicated . . . that ICWA is applicable." The court stated that the Act, "itself, says parent enrolled—either child enrolled or parent enrolled and child eligible for enrollment. And neither one of those occurred here." Although there had been discussion that father was eligible for enrollment, he had not actually enrolled.

The court further found there was a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the child if returned home, and there was no reasonable means the child's health could be protected without removal. The court bypassed reunification services, ordered adoption as the permanent plan, and set the matter for a section 366.26 hearing.

**DISCUSSION**

### ICWA Does Not Apply

Father contends the "record in this case is replete with indications that the Indian Child Welfare Act should apply." Specifically, father asserts that where ICWA applies, then active efforts must be made to prevent the breakup of an Indian family, and here, "no active efforts findings were made and no qualified Indian Expert testified as to the best interests of the child." Notably, father has not provided any argument as to *why* he thinks ICWA should apply.

ICWA applies to any state court proceedings involving the foster care or adoptive placement of, or termination of parental rights to, an Indian child. (25 U.S.C. §§ 1903(1), 1911(a)–(c), 1912–1921.) " 'Indian child' " is defined as a child who is either (1) "a member of an Indian tribe," or (2) "eligible for

9

membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4).) "On appeal, we review the juvenile court's ICWA findings for substantial evidence. [Citations.] But where the facts are undisputed, we independently determine whether ICWA's requirements have been satisfied." (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1051.)

After parents informed the Department of possible Indian ancestry in the Bad River Band of Lake Superior Chippewa through mother, and the Osage Nation through father, the Department sent ICWA-030 forms to both tribes, the Department of the Interior and the Bureau of Indian Affairs. The Department called the Osage Nation and was informed paternal great-grandmother and paternal grandmother were both enrolled and that father and minor were eligible for enrollment with the tribe. Thereafter, the Osage Nation sent the Department a letter confirming that information. The Department followed up with the tribe to see if they would be intervening in the case. The tribe, in turn, responded by e-mail, that while minor's paternal grandmother was a member, neither minor nor his parents were members of the tribe, thus the "situation does not meet the requirements of ICWA."

The Department followed up again seeking clarification on minor's eligibility. The Osage Nation responded by letter that they had no authority to intervene because minor was "not a member of the Osage Nation and neither are either of his parents." The tribe wrote "ICWA defines an 'Indian child' as 'any unmarried person who is under age eighteen and is either (1) a member of an Indian tribe or (2) is eligible for membership in an Indian tribe **and** is the biological child of a member of an Indian tribe' [citation]. As of today, 12/3/2020, [minor] is not considered an Indian child under the ICWA. By virtue of paternal grandmother's membership, father and [minor] are

10

eligible for membership with the Osage Nation, however, [the Osage Nation Social Services] is not empowered to intervene at this time as neither parent nor child are members. Upon membership of father and/or [minor], [the Osage Nation Social Services] would feel empowered to intervene as a party at that time under the ICWA."[4]

Here, the Department and the court ultimately determined ICWA did not apply because the tribe determined minor was not an Indian child. As the tribe noted, minor is neither a member of a tribe, nor is he both eligible for membership and the biological child of a member of a tribe. Father has not made any offer of proof that his status or minor's status has changed or, indeed, why he thinks ICWA should apply given these circumstances.

Accordingly, the juvenile court made an appropriate finding based on the record and the circumstances before it. (See *D.S., supra*, 46 Cal.App.5th at p. 1054.)

***Reunification Services***

Generally, the juvenile court must order reunification services for a parent and child when the child is removed from the parent's custody. (§ 361.5, subd. (a).) However, "[r]eunification services need not be provided to a parent or guardian . . . when the court finds, by clear and convincing evidence," any of a list of circumstances that qualify for denial of services under section 361.5, subdivisions (b)(1) through (16). (*Id.,* subd. (b).)

Reunification services may be bypassed "when the [juvenile] court finds, by clear and convincing evidence," that "the child was brought within the jurisdiction of the court under subdivision (e) of Section 300 because of

---

[4] The Department also followed up with the Bad River Band of Lake Superior Chippewa for mother, and that tribe stated mother was not eligible for enrollment.

11

conduct of that parent or guardian." (§ 361.5, subd. (b)(5).) Section 300, subdivision (e) applies when "[t]he child is under the age of five years and has suffered severe physical abuse by a parent, or by any person known by the parent, if the parent knew or reasonably should have known that the person was physically abusing the child." (§ 300, subd. (e).) Services cannot be ordered if section 361.5, subdivision (b)(5) applies unless the court finds "services are likely to prevent reabuse or continued neglect of the child or that failure to try reunification will be detrimental to the child because the child is closely and positively attached to [the] parent." (§ 361.5, subd. (c)(3).)

Reunification services may also be bypassed when the juvenile court finds by clear and convincing evidence that "the child has been adjudicated a dependent pursuant to any subdivision of Section 300 as a result of . . . the infliction of severe physical harm to the child . . . by a parent or guardian, as defined in this subdivision, and the court makes a factual finding that it would not benefit the child to pursue reunification services with the offending parent or guardian." (§ 361.5, subd. (b)(6)(A).) "A finding of the infliction of severe physical harm . . . may be based on, but is not limited to, deliberate and serious injury inflicted to or on a child's body . . . by an act or omission of the parent or guardian. . . ." (§ 361.5, subd. (b)(6)(C).) When a court bypasses services under subdivision (b)(6), the court must read into the record the basis for the finding of the infliction of severe physical harm. (§ 361.5, subd. (k).) Services cannot be ordered if section 361.5, subdivision (b)(6) applies "unless the court finds, by clear and convincing evidence, that reunification is in the best interest of the child." (§ 361.5, subd. (c)(2).)

We review an order denying reunification services for substantial evidence. (*D.F. v. Superior Court* (2015) 242 Cal.App.4th 664, 669.) In doing so, we view the evidence in the light most favorable to the prevailing party,

and "indulge all legitimate and reasonable inferences to uphold the [juvenile] court's order." (*Patricia W. v. Superior Court* (2016) 244 Cal.App.4th 397, 419.)

Parents contend the court "should not have bypassed the parents['] family reunification services due to the standard of proof." (Capitalization omitted.) Father cites to *K.F. v. Superior Court* (2014) 224 Cal.App.4th 1369 (*K.F.*) as "substantially similar to the case at hand."

*K.F.* also involved a minor who suffered serious injuries, including subdural hematomas, rib and elbow fractures, and bruising. At the jurisdiction hearing, the juvenile court "stated it was more likely than not that the injuries occurred during the caretaking by one or both of the parents, and it could not determine which parent committed the abuse, although it suspected it may have been Mother. Based on this conclusion, the court found true the section 300(e) abuse allegation against both parents," but emphasized its finding "was based on a preponderance of the evidence, and it could not reach this finding by clear and convincing evidence. The court then amended the petition to add a section 300(b) failure-to-protect count. The court found this second count true by clear and convincing evidence 'based on the same basic factual averments' as the section 300(e) abuse count." (*K.F.*, *supra,* 224 Cal.App.4th at pp. 1375, 1380.)

At the disposition hearing, the juvenile court denied reunification services under section 361.5, subdivision (b)(5) stating "it was finding 'by clear and convincing evidence' that [the minor] had been adjudicated a dependent 'as a result of the infliction of severe physical harm, and that the court found earlier that harm was caused by parents.'" (*K.F., supra,* 224 Cal.App.4th at pp. 1375, 1381, 1385.) Specifically, the juvenile court "stated section 361.5(b)(5) applied because the *existence* of the section 300(e)

13

abuse finding was established by clear and convincing evidence.  Further, the court stated section 361.5(b)(6) applied because it found by clear and convincing evidence that [minor] was adjudicated a dependent 'pursuant to any subdivision [of section] 300' and 'she was found so as a result of the infliction of severe physical harm, and that the court found earlier that harm was caused by the parents." (*K.F.,* at p. 1385, italics added.)

The Court of Appeal reversed the denial of services, stating the juvenile court's "section 300(e) abuse finding by a preponderance of the evidence does not satisfy the clear and convincing evidence showing required for denial of services under section 361.5(b)(5).  Further, the court's section 300(b) failure-to-protect finding by clear and convincing evidence cannot, *on this record,* reasonably encompass a clear and convincing showing of infliction of severe physical harm required for denial of services under section 361.5(b)(6) because the severe-physical-harm finding was based on the *same* facts as the section 300(e) abuse finding." (*K.F., supra,* 224 Cal.App.4th at p. 1384, italics added.)  "[I]n this case, the [juvenile] court's section 361.5(b)(6) finding that the parents' act, omission, or consent caused the harm is supported by the *same facts* underlying the section 300(e) abuse finding—i.e., that each parent was responsible for [minor]'s injuries because the parent either committed the abuse or was in a position to know about the other parent's abuse. . . . [¶] Because the court expressly confined its section 300(e) abuse finding to a preponderance of the evidence and the section 361.5(b)(6) infliction-of-harm finding was derived from the same facts, we cannot reasonably construe the

14

record as meeting the clear and convincing requirement for denial of reunification services."[5] (*Id.* at p. 1387.)

Father's reliance on *K.F.* is misplaced. While the juvenile court here made a section 300, subdivision (e) finding at the jurisdiction hearing based on preponderance of the evidence, unlike in *K.F.,* the court went on to make a finding of severe physical abuse by a parent by clear and convincing evidence at the disposition hearing and expressly did not base its denial of reunification services on section 361.5, subdivision (b)(5).

Indeed, the court explained, "There is quite a legal conundrum in this case, and that is that Judge Feeney specifically did not find by clear and convincing evidence that the child came within Section 300(e). I cannot sit in judgment and relitigate that issue. I think that, frankly, that would be for some Court of Appeal to review. If he couldn't find it there, then—and, frankly, if there was a juris/dispo in that moment, I would be fairly confident that any judge that made that determination would find that it would be wrong to apply the bypass provision that is contained in section 361.5(b)(5). . . . [¶] But I'm going to adhere at this point to say that if there was some review of the record in this case, which I am sure there will be, that if it was found that there should have been a finding of 300(e) by clear and convincing evidence, then I do want to say that I believe that the—that the provisions of 361.5(c)(3) would be—would apply here, the Court could not

---

[5] The appellate court also rejected the agency's assertion that at the disposition hearing, the issue is only whether the *existence* of a subdivision (e) finding is demonstrated by clear and convincing evidence. "When a court has made a section 300(e) abuse finding at the jurisdictional phase, the mere fact of its *existence* will be apparent at the dispositional phase simply because the section 300(e) ruling is part of the record. It serves no purpose to impose a clear and convincing evidence requirement on the existence of a finding that is obviously part of the record." (*K.F., supra,* 224 Cal.App.4th at p. 1388.)

15

make the affirmative findings required, and that bypass be mandated.  I'm not applying that section in this case, because I'm finding that I cannot make a clear and convincing finding as it relate[s] to the 300(e) finding.  [¶] What I will say is that that's not the only analysis. . . ."

The juvenile court then went on to address section 361.5, subdivision (b)(6), stating "there clearly is serious physical harm that, I think, the evidence showed occurred on more than one occasion."  "[T]he Court's concern here is the parents are unable to give any explanation for injuries that occurred over a period of time.  The Court believes that it's highly likely that one or probably both did or saw something to explain the multiple traumas this child sustained and are protecting themselves or others, rather than assist the Court in its decision today.  The lack of transparency and desire to protect someone other than the child leads me to conclude that the child is at continued risk of harm and that there really is no services that can be provided that could move us past that point.  [¶] . . . [¶] The Court does find by clear and convincing evidence that the child has been adjudicated a dependent as a result of severe physical . . . harm to the child by a parent and would not benefit from the child to pursue reunification services with the offending mother and father.  And the Court is finding that it is either the actual act of harm or the omission of a duty, that because of multiple traumas, the Court believes that both parents fall within that category in this case."

Parents, however, have focused solely on the juvenile court's section 361.5, subdivision (b)(5), finding and have therefore failed to demonstrate that the court's section 361.5, subdivision (b)(6) finding was erroneous.  And given the latter finding, made on the basis of clear and convincing evidence, the court did not err in bypassing reunification services.

16

**DISPOSITION**

The petition for extraordinary writ relief is denied on the merits. (Cal. Rules of Court, rule 8.452(h)(1); see § 366.26, subd. (*l*).) The request for stay is denied. This decision shall be final immediately in the interests of justice. (Cal. Rules of Court, rules 8.452(i), 8.490(b)(2)(A).)

_____
Banke, J.

We concur:


_____
Humes, P.J.


_____
Margulies, J.

A162010, A.P. v. Superior Court for the County of Humboldt