Filed 5/24/21  In re Carter L. CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re CARTER L., a Person Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ALICIA R.,<br><br>    Defendant and Appellant. | F081599<br><br>(Super. Ct. No. 19CEJ300361-1)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from an order of the Superior Court of Fresno County.  Brian M. Arax, Judge.

Michelle L. Jarvis, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Cederborg, County Counsel, and Lisa R. Flores, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Dependency jurisdiction was taken over then six-year-old Carter L. and he was removed from both his parents' custody (Welf. & Inst. Code,[1] § 361). His mother, Alicia R. (mother), appeals the juvenile court's jurisdictional and dispositional findings and orders, contending the evidence did not support either the juvenile court's true finding of the jurisdictional allegation that pertained to her nor the factual findings underlying the court's order removing Carter from her custody.[2] Mother also contends the juvenile court's finding at the combined jurisdiction/disposition hearing that the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.) did not apply was unsupported by the evidence because the Fresno County Department of Social Services (department) failed to comply with its duty of inquiry. We remand for proceedings to ensure ICWA compliance and otherwise affirm the juvenile court's jurisdictional/ dispositional findings and order.

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

[2] On May 19, 2021, while this appeal was pending, appellant filed a request to take judicial notice of a May 18, 2021 minute order from the underlying case, indicating that Carter had been returned to mother on family maintenance services. At oral argument on May 20, 2021, mother contended this event was relevant to our review of the juvenile court's dispositional order removing Carter from mother's custody. The department did not object to our taking judicial notice of the minute order but contended the event rendered mother's issue regarding removal moot. We disagree with both mother and the department's contentions.

We do not find the minute order relevant to our review of the court's disposition order as our review is limited to the evidence before the juvenile court at the time the order was made. (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1135, fn. 1 [judicial notice should be taken only of relevant matters]; *Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3 ["Reviewing courts generally do not take judicial notice of evidence not presented to the trial court."].) We also find the minute order does not render the issue of removal moot to the extent that it may have an effect on future proceedings in the case, including, but not limited to, the timeline of reunification should Carter be removed from mother again while still subject to the jurisdiction of the juvenile court.

Mother's request for judicial notice is denied.

## FACTUAL AND PROCEDURAL BACKGROUND

Mother and L.L. (father)[3] were in a relationship from approximately 2011 to 2015. Carter was born in 2013. The parents shared custody of Carter, with the most recent custody order from July 2019 designating that Carter spend alternate weeks with each parent.

In October 2019, the department received a crisis referral alleging physical abuse against father from what appears to be a result of mother and Carter attending a mediation in family court. The reporting party noticed a bruise on Carter's right cheek, and when Carter was asked how he received the bruise, he said he could not remember. Carter then volunteered that father had "smacked him" at the dinner table, hit him for no reason, and was "very mean." Carter went on to comment that he (Carter) needs to stay away from his mother's boyfriend, James, who hits him, and said everything would be different after "all of this 'was taken care of.' "

A family law mediator reported to the investigating social worker that Carter reported to the mediator that James hit him, but it appeared to the mediator Carter may have been "coached." The mediator advised that Carter's statement that James hit him was "old information" because James was no longer living with Carter and mother. Carter disclosed to the mediator that he did not feel safe with father because father was mean and wanted to hurt mother.

As the department began investigating the referral, Carter gave several inconsistent statements about how he received the bruise on his cheek. On different occasions, he stated he got the bruise when James' eight-year-old child punched him, James hit him, and father pushed him off a chair. When speaking with the social worker, Carter denied his father hit him but advised that father used to hit him with a belt and

---

**3**    Father is not a party to this appeal and, to our knowledge, has not separately appealed.

3.

with his hands on Carter's buttocks. Carter told a social worker that mother and father fight, yell the "F" and "N" word at each other, and say they are going to kill each other when they drop him off for the exchange. Carter said he did not believe his parents would kill each other but that, if someone did, it would be father because father had a sniper rifle at home. Carter advised he was not scared to go home to his father but was afraid of James. Carter later told a police officer who was assisting the social worker that father does hit him and that he did not feel safe with father. Carter made multiple comments to social workers and the police officer suggesting that though he was not supposed to see James at the time, mother had told him he would be moving back in with James after the "situation" was "over." The officer placed a protective hold on Carter.

Mother reported to the social worker that Carter was scared of father because father "beats the shit" out of Carter. Mother said Carter had complained to her of his back hurting because father had hit him in the head and knocked him out of a chair. Mother did not report the incident because she had previously called child protective services (CPS) and the police over bruises father inflicted onto Carter and they did not do anything. Mother confirmed there was a no-contact order between James and Carter, and that James and Carter had not seen each other for about four months. Mother reported she and Carter currently lived with Carter's maternal grandmother.

Father reported to the social worker that he did not see a bruise on Carter and denied hitting Carter. Father said he stopped spanking Carter after taking a parenting class. The department later discovered father had a previous criminal history including infliction of corporal injury on a spouse or cohabitant.

On October 28, 2019, a "Team Decision Making" (TDM) meeting was held. Present were mother; father; paternal grandparents; paternal uncle; maternal grandparents; James, whom mother referred to as her fiancé; several social workers; and the TDM facilitator. When asked if mother had any concerns, mother responded that every week she has Carter, Carter tells her father has "whooped him." James denied

4.

hitting Carter but explained there was an active no-contact order due to prior allegations, and he had not seen Carter for four months. Mother admitted that she had Carter say hi to James on Skype in violation of the no-contact order. One of the social workers reported that one reason the no-contact order was in place was because of some sexual abuse allegations that law enforcement was currently investigating. Mother stated she does not plan to move back in with James until the no-contact order is dropped. When asked about Carter's report that the parents scream at each other at exchanges, the parents stated that had occurred in the past but had since ceased. One of the social workers recommended the parents obtain counseling together, and the parents refused.

The supervising social worker presented two options at the TDM meeting: (1) Carter be placed with mother so long as she filed an ex parte petition in family court and agreed to keep Carter until a judge made a decision, or (2) the department file a dependency petition and Carter be placed in foster care. All parties agreed they did not want Carter in foster care, but the two sides of the family began arguing because paternal grandparents wanted Carter during father's custody time. The family members began yelling, and the supervising social worker had to yell over them in order to say a petition would have to be filed because it was not safe to release Carter to father, and mother could not be protective of Carter because the family could not come up with a safety plan to keep Carter safe until they could get into family court. The yelling continued and security had to be called. Mother yelled at father that it was all his fault and began to cry on the floor.

The department filed a dependency petition on behalf of Carter on October 29, 2019. The petition alleged that Carter came within the juvenile court's jurisdiction under section 300, subdivisions (a) (serious physical harm) and (b)(1) (failure to protect). Under section 300, subdivision (a), count a-1 alleged that Carter suffered serious physical harm inflicted nonaccidentally by father, including, but not limited to, bruising on his right cheek and reports that father "smacked" Carter and hits Carter with a belt. Under

5.

section 300, subdivision (b)(1), counts b-1 and b-2 alleged that Carter was at substantial risk of suffering serious physical harm due to the parents' history of exposing him to "an unsafe environment of ongoing domestic violence."[4] Carter was placed with the maternal grandmother.[5]

On November 7, 2019, the juvenile court found a prima facie showing had been made that Carter was a person described by section 300 and detained Carter from both parents. The court ordered both parents to have supervised visits, and recommended the parents participate in parenting classes, mental health evaluation and services, and domestic violence evaluation and services. A contested jurisdiction/disposition hearing was set.

In the department's jurisdiction/disposition report, the recommendation was for the court to find the allegations in the petition true, remove Carter from the parents' custody, and order the parents to participate in family reunification services. The report indicated on November 2, 2019, a referral was made to the department alleging that Carter reported James pushes him and hits him, and that James' son had touched him in a sexually inappropriate way. It was reported Carter told this to his mother and James' son was "whipped." It was further reported mother advised Carter not to report anything to father because it would take her longer to get Carter back. The referral was "evaluated out" because Carter was already in care. The report indicated the department was "worried that the parents [] will continue to have domestic violence issues in front of

---

[4]    The petition also included count b-3, which alleged father had an alcohol abuse problem that negatively affected his ability to provide care, protection, and supervision of Carter. Following the evidence portion of the jurisdiction/disposition hearing, the juvenile court found count b-3 not true. Because the facts related to this allegation have minimal relevance to the issues on appeal, we omit them in the interest of brevity.

[5]    Mother and Carter lived with maternal grandmother at the time the petition was filed. It is unclear where mother lived after Carter was placed with maternal grandmother, but it appears she lived with James.

Carter and expose him to unsafe environments." The report further indicated the department "is also worried that [father] and [James] will continue to physically abuse Carter, leaving Carter at risk of severe physical and emotional harm." The report indicated the department had referred the parents to parenting classes and the parents had participated in domestic violence assessments, the results of which were pending.

The combined jurisdiction/disposition hearing was held over August 3, 4, and 14, 2020.

Father testified on his behalf. Father admitted to spanking Carter on his buttocks when Carter was two or three years old but denied ever hitting Carter on his face. Father testified there was no domestic violence between him and mother; he had never hit or pushed her, and they had only ever gotten into verbal arguments. He admitted being arrested for domestic violence against mother once but stated the charges were dismissed because he took an anger management course. According to father, there were no domestic violence calls before or after that incident. Father admitted he threatened to kill mother once in 2015 or 2016 when she arrived at his house and blocked the driveway.

Mother testified on her behalf. Mother had filed five to eight requests for modification in family court to obtain more custody time with Carter. Most recently, in October 2019, she attended a mediation where mother requested father's custody time be reduced to every other weekend because father had been making threats and not treating Carter "how he should be treating him." According to mother, the mediator suggested that mother request full custody since mother claimed father was hurting Carter. The mediator prepared a recommendation that mother have full custody and father have supervised visits. This recommendation never moved forward because Carter was removed due to the present dependency proceedings.

Mother testified there was "lots" of domestic violence in her relationship with father; it was mostly verbal and emotional but became physical towards the end of the relationship. Mother described a physical domestic violence incident that occurred in

7.

October 2015, where father grabbed mother and started choking her; she screamed at the top of her lungs, ran away from him, and drove to her mother's house where she called the police. She had bruises all over her neck. A five-day automatic emergency protective order was issued. She ended the relationship with father at that time. Mother did not go to court to seek a more permanent restraining order "because [father is] Carter's dad so I don't want to make it harder for Carter to be able to see him."

Mother had seen father be physically abusive toward Carter during their relationship; father used to "whoop [Carter] all the time." Father also made Carter sit on the potty for hours at a time, and when Carter would try to stand, father would push Carter back down and yell at him.

After mother ended the relationship with father, there continued to be issues between them and with Carter. Mother said in December 2016, she took a video of father threatening to kill her; she provided the video to the court. In March 2018, mother observed long bruises on Carter's butt and back, and Carter reported father "whooped" him with a belt. Mother called the police, and CPS contacted her the next day but ultimately "left that situation alone." Mother sent Carter back with father the following Monday because of the custody order. Mother attempted to get full custody at that time, but it was not granted. Mother said in the fall of 2018, on Carter's first day of kindergarten in the cafeteria of Carter's school, father yelled at her and told her to "shut the F up before he slaps the shit out of" her in front of other parents while she was holding Carter. One of the parents called CPS over the incident.

Mother opined that Carter was "[d]efinitely" currently at risk of severe harm if father regains shared custody of him because "it's happened more than once and I don't believe it's going to stop. It's not only Carter. I've called for domestic violence. His own parents have called on him for talking to CPS or for his parents talking to me. He's tried to attack his own parents so they've called the cops on him to make him leave."

8.

Mother testified that as a result of the domestic violence assessment she attended, she was referred to a class she was "disputing" because she did not understand why she had to take it. She missed the date to start the class and was not currently enrolled. When asked if she could be protective of Carter if he were placed with her, she responded, "[o]f course." When asked what being protective of him required her to do, she said that she would not let him outside. When asked if she wanted Carter to have a relationship with father, she responded, "[o]f course." Mother testified she had many support people including her mother, stepfather, aunt, and her fiancé James who she noted had full custody of his children. Mother reported James "helps me a lot" with Carter.

Mother's stepfather and Carter's care provider, William S., testified on behalf of mother. William testified that Carter had told him of "many" incidents where father committed domestic violence against Carter, but William had not personally witnessed any of them. Carter had nightmares where he has had to protect mother from clowns with sniper rifles and has told William several times that father has a sniper rifle. Carter also told William that father hits him and tells him to tell others that James did it. Father has twice threatened physical violence towards William by saying he was going to take him outside and settle this, including once during the TDM meeting, which is the reason security was called.

William testified that when Carter was having in-person visitation with his parents, he was displaying behaviors such as having nightmares, defecating in his pants at school, and displaying rage at school. After the in-person visits ceased due to COVID precautions, these behaviors stopped. When Carter later learned he would be having an in-person visit with father, he had a terrible nightmare that night and defecated in his pants and displayed rage at school the next day.

Mother called social worker, Helani Ethen, to testify. Ethen testified that though the parents were no longer in a relationship, the department was concerned because they

were not able to effectively coparent Carter or communicate in regard to his well-being and his needs. Though mother had stated she has taken coparenting and domestic violence classes in the past, in the department's view, she has failed to protect Carter from the exposure and alleged physical abuse that continues after several years. The department was also concerned that mother did not want to fully engage and participate in the child abuse intervention classes recommended as a result of her domestic violence assessment. Carter had told Ethen that father said he was going to harm mother and that he (Carter) would not see mother again. The parents' fighting makes Carter very sad and causes him to experience nightmares. According to Ethen, Carter's care providers informed her that Carter had nightmares after being informed he would be visiting with both his parents after in-person visits resumed. Carter told Ethen he had had nightmares every night since visiting with his parents on that occasion. Though Carter has reported feeling safe during visits with his parents, he was scared of his nightmares.

Further concerns with mother included her allowing James to have communication with Carter despite there being a no-contact order; this demonstrated that mother had not followed court orders nor been protective of Carter. Ethen said mother requested that Ethen help her get the no-contact order lifted. Carter has expressed to Ethen that he is afraid of James and his children. In March 2020, Carter did an exercise where he was to draw pictures in a "House of Dreams" and a "House of Worry." This exercise is a method used by social workers to help children of Carter's age to express what they consider to be safe and what they consider to be something that scares them or concerns them. Carter put his parents and grandparents in his "House of Dreams" and James and James' children in his "House of Worry." Carter has expressed he does not want to go to mother's home because James is there. Services are needed to help mother identify safety concerns.

10.

After the close of evidence, counsel for the department stated it was requesting the court to withdraw the section 300, subdivision (a) allegation and find the rest of the counts true.

Counsel for Carter requested the court to sustain the petition in its entirety. Counsel argued there was not clear and convincing evidence that substantial danger existed if Carter were returned to mother.

Counsel for mother requested the court to sustain the section 300, subdivision (a) count and dismiss the section 300, subdivision (b) count that pertained to mother. Mother requested that Carter be placed with her on family maintenance services.

The juvenile court began its ruling by stating, "Father and mother historically, and continuing into the present, have a very serious history of domestic violence." As for mother's part, the court noted it "does find it surface appealing and tempting to accept the logic that mom is purely a victim of domestic violence" but, in the present case, it appeared mother's position that she had done nothing, had no responsibility, and all she had tried to do is go to court and have father obey court orders did not "adequately reflect[] the bigger picture I see here." The court went on to state that mother was involved in domestic violence with father "for a protracted period of time before leaving in 2015" and there were "distinct and definite worries about the same" with James as evidenced by Carter's multiple statements of fear of him and the no-contact order. The court reasoned that the domestic violence between the parents Carter had been exposed to, "the lack of success in managing [the domestic violence issues] through the system," and the concerns regarding James, demonstrated "a distinct and definite lack of protective capacity." The court noted the video mother introduced displayed "classic domestic violence" on the part of father, and mother "continues to engage, especially knowing [father] and his propensity for violence that she describes, continues to engage him, [and] does not simply leave and access legal authorities, whether the courts or public law enforcement." The court noted in the video, mother "[c]ontinues to provoke [father] and

11.

challenge him," evidenced by mother asking father, "Is that a threat? Is that a threat or a promise?," her remarks that "Ain't none of you going to Visalia. I'm leaving the car parked right here," and mother's response to when father says goodbye, where she states, "ain't no goodbye" and remains parked blocking the driveway.

As to the section 300, subdivision (a) allegation, the court noted the bruises which drew the attention of the department standing alone was not a serious enough injury to justify a section 300, subdivision (a) finding "or the risk that [the finding] implies or entails, and the associated bypass considerations," and there was not adequate documentation of the other allegations mother had made against father.

The juvenile court found counts b-1 and b-2 true and thus that Carter came within its jurisdiction under section 300, subdivision (b)(1). The juvenile court found count a-1 not true. The court found if Carter were to remain in the custody of his parents, there was substantial danger to his physical health and emotional well-being and no reasonable means could prevent removal from the parents. Accordingly, the juvenile court ordered Carter removed from the custody of both parents and both parents were ordered to have reasonable third-party supervised visitation with Carter.

## DISCUSSION

### I. Jurisdiction (Count b-1)

In reviewing the sufficiency of the evidence supporting the jurisdictional findings, "we determine if substantial evidence, contradicted or uncontradicted, supports them." (*In re I.J.* (2013) 56 Cal.4th 766, 773.) " ' "[W]e draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." ' " (*Ibid.*) " ' "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." ' " (*Ibid.*) We must review the whole record in the light most favorable to the judgment below to determine whether it

12.

discloses substantial evidence such that a reasonable trier of fact could find that the order is appropriate. (*Ibid.*)

A child comes within the jurisdiction of the juvenile court under section 300, subdivision (b)(1) when, as relevant here: "The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child."

Here, count b-1, which pertains to mother, reads as follows:

> "The child, Carter [], is at substantial risk of suffering serious physical harm and/or neglect in that his mother … has a history of exposing Carter to an unsafe environment of ongoing domestic violence between [mother] and Carter's father…. On or about October 25, 2019, Carter reported [mother] and [father] scream at each other and threaten to kill each other. In addition, Carter reported he believed [father] would act on these threats as he has a sniper rifle at home."

Count b-2 mirrored count b-1, with the exception that in the first sentence mother's name was replaced with father's name, as that count pertains to father.

Mother only challenges the jurisdictional allegation that pertains to her (count b-1) and does not challenge the substantively identical allegation pertaining to father (count b-2). Rather, mother asserts the jurisdictional allegation pertaining to father "should have" been included in the petition. In our view, by failing to challenge the parallel allegation pertaining to father and asserting it was proper, mother in effect concedes substantial evidence supports the allegation pertaining to father and accordingly that the domestic violence between the parents put Carter at risk of serious physical harm or illness. We therefore view mother's contention on appeal as a narrow one: that substantial evidence did not support the allegation pertaining to her because she was merely the victim, not the aggressor, of father's domestic violence.[6] We conclude

---

[6] To the extent mother is taking the position that the section 300, subdivision (b)(1) finding cannot be substantiated because the domestic violence (regardless of who was the

substantial evidence supports the jurisdictional finding as to mother based on her failure to protect Carter from exposure to domestic violence.

Beginning with the recorded domestic violence from 2015, where father choked mother and law enforcement was involved, though mother ended the relationship with father, mother failed to follow through with obtaining a restraining order because, according to her, she did not want to make it more difficult for father to see Carter. Though this particular incident was remote in time, the risk continued; as the years went by, it does not appear from the record mother ever followed through with obtaining a restraining order despite a number of instances of threatened violence towards her. Rather, the evidence shows that mother, with knowledge of father's violent background, in the juvenile court's words, "engaged" with father by provoking him as evidenced by the video and Carter's report that both parents threatened to kill each other in his presence. Though father had taken anger management classes as a result of his domestic violence arrest, the hostility between the parents and violent threats by father continued into the dependency proceedings including in the presence of social workers as evidenced by the TDM meeting where it was decided a petition would be filed. At this meeting, there was yelling, including mother yelling at father it was all his fault and violent threats by father aimed at William. The totality of this evidence supports the juvenile court's finding by a preponderance of the evidence that mother put Carter at risk of physical injury or illness by failing to protect him from exposure to domestic violence. The risk existed at the time of the hearing because mother denied any responsibility for the

aggressor) between the parents did not put Carter at risk of current serious physical harm or illness, we find mother's claim forfeited because she did not make a timely challenge to both allegations, which are substantively identical. (See, e.g., appellant's opening brief, p. 57, which reads: "There was no evidence that mother ever physically harmed Carter or put him at any current risk of physical harm. Although mother and father did not get care for each other [*sic*], there was no evidence of recent violence between the parents.")

14.

problem and resisted engaging in the classes recommended as a result of the domestic violence assessment.

In her brief, mother highlights evidence favorable to her: primarily that social workers had referred to mother as "non-offending," and that she took some action to protect Carter, including the filing of several requests to change the custody order. Mother posits the department made a jurisdictional allegation pertaining to her because they mistakenly thought they had to in order for mother to participate in services. Mother's approach amounts to requesting us to reweigh the evidence. Our role on review is to determine whether substantial evidence supports the order the court made even if other evidence contradicts or supports a contrary order. (*K.F. v. Superior Court* (2014) 224 Cal.App.4th 1369, 1383, fn. 7.)

Substantial evidence supports the juvenile court's jurisdictional finding pertaining to mother.

## II. Disposition

In determining whether substantial evidence supports the juvenile court's dispositional findings, we must account for the clear and convincing standard of proof. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011.) The question before us is "whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Ibid*.) As with our review of the court's jurisdictional findings, we "view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Id*. at pp. 1011–1012.)

A dependent child shall not be taken from the physical custody of his or her parents unless the juvenile court finds clear and convincing evidence that, as relevant here, "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and

15.

there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's … physical custody." (§ 361, subd. (c)(1).) When determining whether a child will be in substantial danger if permitted to remain in the parent's physical custody, the juvenile court must consider, "not only the parent's past conduct, but also current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention." (*In re I.R.* (2021) 61 Cal.App.5th 510, 520 (*I.R*).)

Mother contends the evidence did not support a finding by clear and convincing evidence that returning home to mother would pose a substantial danger to Carter nor that reasonable means were available to protect Carter without removal. We conclude the court's findings were supported by substantial evidence bearing in mind the clear and convincing evidence standard.

In addition to the evidence we have already discussed, which supports the juvenile court's jurisdictional findings, substantial danger to Carter's physical and emotional well-being is demonstrated by mother's failure to appreciate the negative effect that her relationship with James has on Carter. Mother demonstrated a failure to accept there was a reason the court had issued a no-contact order between James and Carter. It appears mother viewed the no-contact order as simply a technical obstacle, rather than a signal Carter was at risk of harm, as evidenced by her denying James had done anything wrong, requesting Ethen to help her get the no-contact order lifted, and telling Carter they would move back in with James as soon as the order was lifted. The risk to Carter was compounded by the fact that mother appeared unphased by Carter's consistent and repeated reports that he did not feel safe with James. Mother's continuing the relationship with James and planning to marry him, involving him in the dependency proceedings by including him at the TDM meeting, testifying that he helps a lot with Carter, and again, telling Carter they would be moving back in with him despite Carter reporting he is afraid of James demonstrates at the very least, substantial danger to

16.

Carter's emotional well-being. On appeal, mother suggests reasonable means to prevent removal included ordering mother to not allow Carter to have contact with James. We disagree. Mother having Carter speak with James over FaceTime despite there being a no-contact order in place, telling Carter they would move back in with James as soon as the no-contact order was lifted even though court proceedings were pending, and failing to appreciate the risk her relationship with James poses at the very least to Carter's emotional well-being demonstrates that mother may not adhere to any order to keep them apart.

Further, the juvenile court could have reasonably concluded this was a pattern of mother's behavior that reflected a lack of protective capacity for Carter. Despite mother's contention that Carter reported father hurt him and her own reports that father routinely "beats the shit" out of and "whoop[s]" Carter, she failed to follow through with obtaining a restraining order to protect Carter from father. On one occasion, when Carter complained of pain inflicted by father, mother failed to report it to the police or the department. In October 2019, when Carter had the bruise, which initially brought the family to the department's attention, mother claimed father harmed Carter but only wished to reduce father's custody time, and it was the mediator who had to suggest full custody.

Finally, the visits between Carter and both parents were still being supervised, and Carter displayed troubling behaviors that the court could have reasonably concluded were related to visits with the parents. At the time of the jurisdiction/disposition hearing, it was not clear what was causing these behaviors or if it was safe to transition to unsupervised visits.

No reasonable means existed to prevent removal from mother's home because mother refused to engage with child abuse intervention services and asserted she did not see the need for them.

Mother's reliance on *I.R.* does not persuade us to come to a different conclusion. In *I.R.*, dependency jurisdiction was taken over a minor who witnessed a domestic violence incident between the mother and the father. (*I.R.*, *supra*, 61 Cal.App.5th at pp. 512–513.) The minor was removed from the father and released to the mother. (*Id.* at p. 513.) The father and the minor appealed the order contending substantial evidence did not support the minor would be in substantial danger in the father's care nor that there were not reasonable means to protect the minor other than removing her from the father. (*Ibid.*) The appellate court agreed, reversing the removal order. The appellate court reasoned the only evidence of substantial danger to the minor in the father's care was historical domestic violence between the mother and the father in the minor's presence. (*Id.* at p. 521.) The appellate court found the record did not support that the father had "ever been violent or aggressive outside the context of his relationship with [the m]other, nor that he is a generally violent, aggressive, or abusive person," and therefore the only danger to the minor was if the domestic violence between the mother and the father continued. (*Ibid.*) The appellate court concluded the record did not support the latter finding because the father did not live in the family home, the father had " 'stay[ed] away from [the m]other,' " and did not reflect any contact between the father and the mother since the juvenile court had ordered the father not to visit the child in the family home or in the presence of the mother. (*Ibid.*)

Unlike in *I.R.*, as we have explained, the danger that existed in mother's home went beyond mother and father's domestic violence. *I.R.* is further distinguishable because though the parents were no longer together as a couple, the hostility between them and therefore the risk to Carter still continued and it had been demonstrated it could not be resolved through family court. Two major incidents mother testified about occurred after the parents had ended their relationship: the Christmas incident where father threatened to kill mother and the cafeteria incident where father threatened to beat her while she was holding Carter. This continued into the dependency proceedings as, at

18.

the TDM meeting, they were unable to come up with a safety plan and engaged in yelling, and father threatened mother's stepfather with physical violence. Mother's demonstration that she does not always comply with court orders, as was the case with the FaceTime call with James, in addition to her testimony that she would not keep Carter away from father despite her other testimony he is a risk to Carter's physical safety, could be reasonably considered by the juvenile court as evidence that placement with mother put Carter at risk of danger.

The juvenile court's dispositional findings that Carter was at substantial danger if placed in mother's home and no reasonable means existed to prevent removal from mother's home are supported by substantial evidence.

## III.  ICWA

### A.  *ICWA Facts*

On or about October 30, 2019, both parents executed a "Parental Notification of Indian Status" (unnecessary capitalization omitted) (ICWA-020) form.  Mother indicated she had no Indian ancestry, and father indicated he may have Indian ancestry but did not list any particular tribes.

At the initial detention hearing on October 30, 2019, the court asked father about his answers on the ICWA-020 form.  Father indicated he left the space blank for the name of the tribe with which he may have ancestry because he did not know.  Upon further questioning from the court, father stated he heard from his grandmother before she passed away it may have been Cherokee or Blackfoot, but she had mentioned a number of tribes.  Father said his family is originally from Atlanta, Georgia, and Mississippi.  The court asked father's parents, who were present, if they had any further information, and paternal grandfather indicated he heard the family may have Cherokee or Blackfoot heritage but did not know of any enrolled members in the family.  The court stated it would be writing "Cherokee/Blackfoot" onto father's ICWA-020 form.  The detention hearing was continued to November 7, 2019, and the court made a finding

19.

ICWA may be applicable based on father's indication of Cherokee/Blackfoot heritage. The court stated that ICWA "will have to be explored" and the department was "on duty."

The department prepared a "Notice of Child Custody Proceeding for Indian Child" (unnecessary capitalization omitted) (ICWA-030) form. The form included father's name and birthdate, and under "Tribe or band, and location," the form indicated "Bureau of Indian Affairs, No Tribe Specified, No Tribe Specified." Under the space for additional information, it was stated that father had provided his familial lineage to the best of his knowledge. For familial information, the form included the first and last names of father's parents (Carter's paternal grandparents) and one of his grandmothers (Carter's paternal great-grandmother), and only the first name of his other grandmother. No other familial information was provided. A copy of father's ICWA-020 form was attached to the ICWA-030 form but did not include the annotation made by the court that father may have Cherokee or Blackfoot heritage. The department served the ICWA-030 form on the Bureau of Indian Affairs (BIA) and the U.S. Department of the Interior but not on any specific tribes.

A letter dated February 20, 2020, was sent to the department from the BIA indicating the notice the BIA received "contains insufficient information to determine Tribal affiliation (25 C.F.R. § 23.11 (d))[.] When additional information becomes available, please forward the Notice to the appropriate Tribe(s) using the latest ICWA Designated Tribal Agents List. This list of available on BIA's website."

The department moved the court to find ICWA inapplicable based on the BIA's response. At the conclusion of the jurisdiction/disposition hearing on August 14, 2020, the court found ICWA did not apply.

**B.** *Analysis*

Mother argues the juvenile court's ICWA finding was not supported by substantial evidence because the department (1) failed to fulfill its duty of initial inquiry by not

20.

asking known paternal relatives for information, and (2) did not fulfill its duty of further inquiry by failing to interview extended family members and gather all available information and failing to contact the tribes identified by father. The department concedes error. We accept the department's concession.

When the court or social worker has "reason to believe"[7] (but not sufficient evidence to determine there is "reason to know") that an Indian child as defined by ICWA[8] is involved in a proceeding, section 224.2, subdivision (e) requires "further inquiry regarding the possible Indian status of the child." (§ 224.2, subd. (e).) "Further inquiry" includes: (1) interviewing the parents, Indian custodian, and extended family members to gather available familial and tribal enrollment information; (2) contacting the BIA and State Department of Social Services for assistance with identifying tribes in which the child may be a member of or eligible for membership; and (3) contacting tribes the child may be affiliated with, and anyone else, that might have information regarding the child's membership or eligibility in a tribe. (§§ 224.2, subd. (e)(2); 224.3, subd. (a)(5).) The agency "has the obligation to make a meaningful effort to locate and interview extended family members to obtain whatever information they may have as to the child's possible Indian status." (*In re K.R.* (2018) 20 Cal.App.5th 701, 709.)

---

[7]     "There is reason to believe a child involved in a proceeding is an Indian child whenever the court, social worker, or probation officer has information suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe. Information suggesting membership or eligibility for membership includes, but is not limited to, information that indicates, but does not establish, the existence of one or more of the grounds for reason to know enumerated in paragraphs (1) to (6), inclusive, of subdivision (d)." (§ 224.2, subd. (e)(1).)

[8]     For purposes of ICWA, an "Indian child" is an unmarried individual under 18 years of age who is either (1) a member of a federally recognized Indian tribe, or (2) is eligible for membership in a federally recognized tribe and is the biological child of a member of a federally recognized tribe. (25 U.S.C. § 1903(4) & (8); see § 224.1, subd. (a) [adopting federal definitions].)

We review the juvenile court's finding that ICWA is inapplicable for substantial evidence. (*In re Rebecca R.* (2006) 143 Cal.App.4th 1426, 1430.) We apply the ICWA statutes that applied at the time of the finding from which mother appeals. (*In re A.M.* (2020) 47 Cal.App.5th 303, 321.)

Father's indication he may have Cherokee or Blackfoot ancestry triggered the department's duty to further inquire into Carter's status as an Indian child. The department's further inquiry was inadequate because it does not appear they attempted to gather the pertinent information from paternal extended family members, and therefore the information reported to the BIA was incomplete and because they did not provide information for the tribes father indicated. Because the department's further inquiry was not adequate, we accept the department's concession the court's finding that ICWA does not apply was not supported by substantial evidence.

## DISPOSITION

The juvenile court's finding that ICWA does not apply is vacated and the matter is remanded to the juvenile court for the department to conduct adequate inquiry required by sections 224.2 and 224.3, and for any further proceedings resulting therefrom.

In all other respects, the order is affirmed.


DE SANTOS, J.

WE CONCUR:


DETJEN, Acting P.J.


SNAUFFER, J.

22.